## MICHELSON *v.* UNITED STATES.

No. 23.   Argued October 14–15, 1948.—Decided December 20, 1948.

470

*Louis J. Castellano* argued the cause for petitioner. With him on the brief was *Daniel McNamara.*

*Joseph M. Howard* argued the cause for the United States. With him on the brief were *Solicitor General Perlman* and *Robert S. Erdahl.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

In 1947 petitioner Michelson was convicted of bribing a federal revenue agent.[1]  The Government proved a

---

[1] The first count charged petitioner with bribing in violation of 18 U. S. C. § 91 (now 18 U. S. C. § 201) and the affirmance of his conviction on this count by the Court of Appeals, 165 F. 2d 732, is the

large payment by accused to the agent for the purpose of influencing his official action. The defendant, as a witness on his own behalf, admitted passing the money but claimed it was done in response to the agent's demands, threats, solicitations, and inducements that amounted to entrapment. It is enough for our purposes to say that determination of the issue turned on whether the jury should believe the agent or the accused.[2]

On direct examination of defendant, his own counsel brought out that, in 1927, he had been convicted of a misdemeanor having to do with trading in counterfeit watch dials. On cross-examination it appeared that in 1930, in executing an application for a license to deal in second-hand jewelry, he answered "No" to the question whether he had theretofore been arrested or summoned for any offense.

Defendant called five witnesses to prove that he enjoyed a good reputation. Two of them testified that their acquaintance with him extended over a period of about thirty years and the others said they had known him at least half that long. A typical examination in chief was as follows:

"Q. Do you know the defendant Michelson?
"A. Yes.
"Q. How long do you know Mr. Michelson?
"A. About 30 years.
"Q. Do you know other people who know him?
"A. Yes.
"Q. Have you had occasion to discuss his reputation for honesty and truthfulness and for being a law-abiding citizen?
"A. It is very good.

judgment here under review. The second count charged "offering" the bribe as a violation of the same statute but his conviction on this count was reversed by the Court of Appeals and is not here involved.

[2] Details appear in the Court of Appeals opinion, 165 F. 2d 732.

"Q. You have talked to others?

"A. Yes.

"Q. And what is his reputation?

"A. Very good."

These are representative of answers by three witnesses; two others replied, in substance, that they never had heard anything against Michelson.

On cross-examination, four of the witnesses were asked, in substance, this question: "Did you ever hear that Mr. Michelson on March 4, 1927, was convicted of a violation of the trademark law in New York City in regard to watches?" This referred to the twenty-year-old conviction about which defendant himself had testified on direct examination. Two of them had heard of it and two had not.

To four of these witnesses the prosecution also addressed the question the allowance of which, over defendant's objection, is claimed to be reversible error:

"Did you ever hear that on October 11, 1920, the defendant, Solomon Michelson, was arrested for receiving stolen goods?"

None of the witnesses appears to have heard of this.

The trial court asked counsel for the prosecution, out of presence of the jury, "Is it a fact according to the best information in your possession, that Michelson was arrested for receiving stolen goods?" Counsel replied that it was, and to support his good faith exhibited a paper record which defendant's counsel did not challenge.

The judge also on three occasions warned the jury, in terms that are not criticized, of the limited purpose for which this evidence was received.[3]

---

[3] In ruling on the objection when the question was first asked, the Court said:

". . . I instruct the jury that what is happening now is this: the defendant has called character witnesses, and the basis for the evi-

Defendant-petitioner challenges the right of the prosecution so to cross-examine his character witnesses. The Court of Appeals held that it was permissible. The opinion, however, points out that the practice has been severely criticized and invites us, in one respect, to change the rule.[4] Serious and responsible criticism has

dence given by those character witnesses is the reputation of the defendant in the community, and since the defendant tenders the issue of his reputation the prosecution may ask the witness if she has heard of various incidents in his career. I say to you that regardless of her answer you are not to assume that the incidents, asked about actually took place. All that is happening is that this witness' standard of opinion of the reputation of the defendant is being tested. Is that clear?"

In overruling the second objection to the question the Court said:

"Again I say to the jury there is no proof that Mr. Michelson was arrested for receiving stolen goods in 1920, there isn't any such proof. All this witness has been asked is whether he had heard of that. There is nothing before you on that issue. Now would you base your decision on the case fairly in spite of the fact that that question has been asked? You would? All right."

The charge included the following:

"In connection with the character evidence in the case I permitted a question whether or not the witness knew that in 1920 this defendant had been arrested for receiving stolen goods. I tried to give you the instruction then that that question was permitted only to test the standards of character evidence that these character witnesses seemed to have. There isn't any proof in the case that could be produced before you legally within the rules of evidence that this defendant was arrested in 1920 for receiving stolen goods, and that fact you are not to hold against him; nor are you to assume what the consequences of that arrest were. You just drive it from your mind so far as he is concerned, and take it into consideration only in weighing the evidence of the character witnesses."

[4] Footnote 8 to that court's opinion reads as follows:

"Wigmore, *Evidence* (3d ed. 1940) § 988, after noting that 'such inquiries are almost universally admitted,' not as 'impeachment by extrinsic testimony of particular acts of misconduct,' but as means of testing the character 'witness' grounds of knowledge,' continues

been aimed, however, not alone at the detail now questioned by the Court of Appeals but at common-law doctrine on the whole subject of proof of reputation or character.[5] It would not be possible to appraise the

with these comments: 'But the serious objection to them is that practically the above distinction—between rumors of such conduct, as affecting reputation, and the fact of it as violating the rule against particular facts—cannot be maintained in the mind of the jury. The rumor of the misconduct, when admitted, goes far, in spite of all theory and of the judge's charge, towards fixing the misconduct as a fact upon the other person, and thus does three improper things,— (1) it violates the fundamental rule of fairness that prohibits the use of such facts, (2) it gets at them by hearsay only, and not by trustworthy testimony, and (3) it leaves the other person no means of defending himself by denial or explanation, such as he would otherwise have had if the rule had allowed that conduct to be made the subject of an issue. Moreover, these are not occurrences of possibility, but of daily practice. This method of inquiry or cross-examination is frequently resorted to by counsel for the very purpose of injuring by indirection a character which they are forbidden directly to attack in that way; they rely upon the mere putting of the question (not caring that it is answered negatively) to convey their covert insinuation. The value of the inquiry for testing purposes is often so small and the opportunities of its abuse by underhand ways are so great that the practice may amount to little more than a mere subterfuge, and should be strictly supervised by forbidding it to counsel who do not use it in good faith.'

"Because, as Wigmore says, the jury almost surely cannot comprehend the judge's limiting instruction, the writer of this opinion wishes that the United States Supreme Court would tell us to follow what appears to be the Illinois rule, i. e., that such questions are improper unless they relate to offenses similar to those for which the defendant is on trial. See *Aiken* v. *People*, 183 Ill. 215, 55 N. E. 695; *cf. People* v. *Hannon*, 381 Ill. 206, 44 N. E. (2d) 923."

[5] A judge of long trial and appellate experience has uttered a warning which, in the opinion of the writer, we might well have heeded in determining whether to grant certiorari here:

". . . evidence of good character is to be used like any other, once it gets before the jury, and the less they are told about the grounds for its admission, or what they shall do with it, the more likely

usefulness and propriety of this cross-examination without consideration of the unique practice concerning character testimony, of which such cross-examination is a minor part.[6]

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt.[7]  Not that the law invests the defendant with a presumption of good character, *Greer* v. *United States,* 245 U. S. 559, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief.  The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime.[8]  The inquiry is not rejected because character is

---

they are to use it sensibly.  The subject seems to gather mist which discussion serves only to thicken, and which we can scarcely hope to dissipate by anything further we can add."  L. Hand in *Nash* v. *United States,* 54 F. 2d 1006, 1007.

In opening its cyclopedic review of authorities from many jurisdictions, Corpus Juris Secundum summarizes that the rules regulating proof of character "have been criticized as illogical, unscientific, and anomalous, explainable only as archaic survivals of compurgation or of states of legal development when the jury personally knew the facts on which their verdict was based."  32 C. J. S. Evidence § 433.

[6] See Maguire, *Evidence: Common Sense and Common Law* (1947).  Compare pp. 203–209 and pp. 74–76.

[7] *Greer* v. *United States,* 245 U. S. 559; 1 Wigmore, *Evidence* (3d ed., 1940) § 57; 1 Wharton, *Criminal Evidence* (11th ed., 1935) § 330.  This was not the earlier rule in English common law and is not now the rule in some civil law countries.  1 Wigmore, *Evidence* (3d ed., § 1940) § 193.

[8] This would be subject to some qualification, as when a prior crime is an element of the later offense; for example, at a trial for being an habitual criminal.  There are also well-established exceptions

476

irrelevant;[9] on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.[10]

But this line of inquiry firmly denied to the State is opened to the defendant because character is relevant in resolving probabilities of guilt.[11] He may introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged. This privilege is sometimes valuable to a defendant for this Court has held that such testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt and that in the federal courts a jury in a proper case should be so instructed. *Edgington* v. *United States,* 164 U. S. 361.

where evidence as to other transactions or a course of fraudulent conduct is admitted to establish fraudulent intent as an element of the crime charged. See, *e. g., Fall* v. *United States,* 60 App. D. C. 124, 49 F. 2d 506, certiorari denied, 283 U. S. 867; *Hatem* v. *United States,* 42 F. 2d 40, certiorari denied, 282 U. S. 887; *Williamson* v. *United States,* 207 U. S. 425; *Allis* v. *United States,* 155 U. S. 117; *Wood* v. *United States,* 16 Pet. 342.

[9] As long ago as 1865, Chief Justice Cockburn said, "The truth is, this part of our law is an anomaly. Although, logically speaking, it is quite clear that an antecedent bad character would form quite as reasonable a ground for the presumption and probability of guilt as previous good character lays the foundation of innocence, yet you cannot, on the part of the prosecution, go into evidence as to bad character." *Reg.* v. *Rowton,* 10 Cox's Criminal Cases 25, 29–30. And see 1 Wigmore, *Evidence* (3d ed., 1940) § 55.

[10] 1 Wigmore, *Evidence* (3d ed., 1940) § 57.

[11] 1 Wigmore, *Evidence* (3d ed., 1940) § 56; Underhill, *Criminal Evidence* (4th ed., 1935) § 165; 1 Wharton, *Criminal Evidence* (11th ed., 1935) §§ 330, 336.

When the defendant elects to initiate a character inquiry, another anomalous rule comes into play. Not only is he permitted to call witnesses to testify from hearsay, but indeed such a witness is not allowed to base his testimony on anything but hearsay.[12] What commonly is called "character evidence" is only such when "character" is employed as a synonym for "reputation." The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits; nor can he testify that his own acquaintance, observation, and knowledge of defendant leads to his own independent opinion that defendant possesses a good general or specific character, inconsistent with commission of acts charged. The witness is, however, allowed to summarize what he has heard in the community, although much of it may have been said by persons less qualified to judge than himself. The evidence which the law permits is not as to the personality of defendant but only as to the shadow his daily life has cast in his neighborhood. This has been well described in a different connection as "the slow growth of months and years, the resultant picture of forgotten incidents, passing events, habitual and daily conduct, presumably honest because disinterested, and safer to be trusted because prone to suspect . . . . It is for that reason that such general repute is permitted to be proven. It sums up a multitude of trivial details. It compacts into the brief phrase of a verdict the teaching of many incidents and the conduct of years. It is the average intelligence drawing its conclusion." Finch, J., in *Badger* v. *Badger,* 88 N. Y. 546, 552.

While courts have recognized logical grounds for criticism of this type of opinion-based-on-hearsay testimony,

---

[12] 5 Wigmore, *Evidence* (3d ed., 1940) § 1609; Underhill, *Criminal Evidence* (4th ed., 1935) § 170; 1 Wharton, *Criminal Evidence* (11th ed., 1935) § 333.

478

it is said to be justified by "overwhelming considerations of practical convenience" in avoiding innumerable collateral issues which, if it were attempted to prove character by direct testimony, would complicate and confuse the trial, distract the minds of jurymen and befog the chief issues in the litigation. *People* v. *Van Gaasbeck,* 189 N. Y. 408, 419, 82 N. E. 718, 721.

Another paradox in this branch of the law of evidence is that the delicate and responsible task of compacting reputation hearsay into the "brief phrase of a verdict" is one of the few instances in which conclusions are accepted from a witness on a subject in which he is not an expert. However, the witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded. To require affirmative knowledge of the reputation may seem inconsistent with the latitude given to the witness to testify when all he can say of the reputation is that he has "heard nothing against defendant." This is permitted upon assumption that, if no ill is reported of one, his reputation must be good.[13] But this answer is accepted only from a witness whose knowledge of defendant's habitat and surroundings is intimate enough so that his failure to hear of any relevant ill repute is an assurance that no ugly rumors were about.[14]

Thus the law extends helpful but illogical options to a defendant. Experience taught a necessity that they

---

[13] *People* v. *Van Gaasbeck,* 189 N. Y. 408, 420, 82 N. E. 718, 722. The law apparently ignores the existence of such human ciphers as Kipling's Tomlinson, of whom no ill is reported but no good can be recalled. They win seats with the righteous for character evidence purposes, however hard their lot in literature.

[14] *Id.;* 5 Wigmore, *Evidence* (3d ed., 1940) § 1614; Underhill, *Criminal Evidence* (4th ed., 1935) § 171; 1 Wharton, *Criminal Evidence* (11th ed., 1935) § 334.

be counterweighted with equally illogical conditions to keep the advantage from becoming an unfair and unreasonable one. The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses [15] to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion.[16] It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

[15] 1 Wigmore, *Evidence* (3d ed., 1940) § 58; Underhill, *Criminal Evidence* (4th ed., 1935) § 167; 1 Wharton, *Criminal Evidence* (11th ed., 1935) § 330.

[16] A classic example in the books is a character witness in a trial for murder. She testified she grew up with defendant, knew his reputation for peace and quiet, and that it was good. On cross-examination she was asked if she had heard that the defendant had shot anybody and, if so, how many. She answered, "three or four," and gave the names of two but could not recall the names of the others. She still insisted, however, that he was of "good character." The jury seems to have valued her information more highly than her judgment, and on appeal from conviction the cross-examination was held proper. *People* v. *Laudiero*, 192 N. Y. 304, 309, 85 N. E. 132. See also *People* v. *Elliott*, 163 N. Y. 11, 57 N. E. 103.

To thus digress from evidence as to the offense to hear a contest as to the standing of the accused, at its best opens a tricky line of inquiry as to a shapeless and elusive subject matter. At its worst it opens a veritable Pandora's box of irresponsible gossip, innuendo and smear. In the frontier phase of our law's development, calling friends to vouch for defendant's good character, and its counterpart—calling the rivals and enemies of a witness to impeach him by testifying that his reputation for veracity was so bad that he was unworthy of belief on his oath—were favorite and frequent ways of converting an individual litigation into a community contest and a trial into a spectacle. Growth of urban conditions, where one may never know or hear the name of his next-door neighbor, have tended to limit the use of these techniques and to deprive them of weight with juries. The popularity of both procedures has subsided, but courts of last resort have sought to overcome danger that the true issues will be obscured and confused by investing the trial court with discretion to limit the number of such witnesses and to control cross-examination. Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject.[17]

Wide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse.

---

[17] See, e. g., *Mannix* v. *United States*, 140 F. 2d 250. It has been held that the question may not be hypothetical nor assume unproven facts and ask if they would affect the conclusion, *Little* v. *United States*, 93 F. 2d 401; *Pittman* v. *United States*, 42 F. 2d 793; *Filippelli* v. *United States*, 6 F. 2d 121; and that it may not be so asked as to detail evidence or circumstances of a crime of which defendant was accused. *People* v. *Marendi*, 213 N. Y. 600, 107 N. E. 1058. It

The trial judge was scrupulous to so guard it in the case before us. He took pains to ascertain, out of presence of the jury, that the target of the question was an actual event, which would probably result in some comment among acquaintances if not injury to defendant's reputation. He satisfied himself that counsel was not merely taking a random shot at a reputation imprudently exposed or asking a groundless question to waft an unwarranted innuendo into the jury box.[18]

The question permitted by the trial court, however, involves several features that may be worthy of comment. Its form invited hearsay; it asked about an arrest, not

---

has been held error to use the question to get before the jury a particular derogatory newspaper article. *Sloan* v. *United States*, 31 F. 2d 902. The proof has been confined to general reputation and that among a limited group such as fellow employees in a particular building held inadmissible. *Williams* v. *United States*, 168 U. S. 382.

[18] This procedure was recommended by Wigmore. But analysis of his innovation emphasizes the way in which law on this subject has evolved from pragmatic considerations rather than from theoretical consistency. The relevant information that it is permissible to lay before the jury is talk or conversation about the defendant's being arrested. That is admissible whether or not an actual arrest had taken place; it might even be more significant of repute if his neighbors were ready to arrest him in rumor when the authorities were not in fact. But before this relevant and proper inquiry can be made, counsel must demonstrate privately to the court an irrelevant and possibly unprovable fact—the reality of arrest. From this permissible inquiry about reports of arrest, the jury is pretty certain to infer that defendant had in fact been arrested and to draw its own conclusions as to character from that fact. The Wigmore suggestion thus limits legally relevant inquiries to those based on legally irrelevant facts in order that the legally irrelevant conclusion which the jury probably will draw from the relevant questions will not be based on unsupported or untrue innuendo. It illustrates Judge Hand's suggestion that the system may work best when explained least. Yet, despite its theoretical paradoxes and deficiencies, we approve the procedure as calculated in practice to hold the inquiry within decent bounds.

a conviction, and for an offense not closely similar to the one on trial; and it concerned an occurrence many years past.

Since the whole inquiry, as we have pointed out, is calculated to ascertain the general talk of people about defendant, rather than the witness' own knowledge of him, the form of inquiry, "Have you heard?" has general approval, and "Do you know?" is not allowed.[19]

A character witness may be cross-examined as to an arrest whether or not it culminated in a conviction, according to the overwhelming weight of authority.[20] This rule is sometimes confused with that which prohibits cross-examination to credibility by asking a witness whether he himself has been arrested.

Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of a witness.

Arrest without more may nevertheless impair or cloud one's reputation. False arrest may do that. Even to be acquitted may damage one's good name if the community receives the verdict with a wink and chooses to remember defendant as one who ought to have been convicted. A conviction, on the other hand, may be accepted as a misfortune or an injustice, and even enhance the standing of one who mends his ways and lives it down. Reputation is the net balance of so many debits and credits that the law does not attach the finality to a conviction, when

---

[19] See *Stewart* v. *United States*, 70 App. D. C. 101, 104 F. 2d 234; *Little* v. *United States*, 93 F. 2d 401; *Filippelli* v. *United States*, 6 F. 2d 121.

[20] See *Mannix* v. *United States*, 140 F. 2d 250; *Josey* v. *United States*, 77 U. S. App. D. C. 321, 135 F. 2d 809; *Spalitto* v. *United States*, 39 F. 2d 782, and authorities there cited.

the issue is reputation, that is given to it when the issue is the credibility of the convict.

The inquiry as to an arrest is permissible also because the prosecution has a right to test the qualifications of the witness to bespeak the community opinion. If one never heard the speculations and rumors in which even one's friends indulge upon his arrest, the jury may doubt whether he is capable of giving any very reliable conclusions as to his reputation.

In this case the crime inquired about was receiving stolen goods; the trial was for bribery. The Court of Appeals thought this dissimilarity of offenses too great to sustain the inquiry in logic, though conceding that it is authorized by preponderance of authority. It asks us to substitute the Illinois rule which allows inquiry about arrest, but only for very closely similar if not identical charges, in place of the rule more generally adhered to in this country and in England.[21] We think the facts of this case show the proposal to be inexpedient.

The good character which the defendant had sought to establish was broader than the crime charged and included the traits of ."honesty and truthfulness" and "being a law-abiding citizen." Possession of these characteristics would seem as incompatible with offering a bribe to a revenue agent as with receiving stolen goods. The crimes may be unlike, but both alike proceed from the same defects of character which the witnesses said this defendant was reputed not to exhibit. It is not only by comparison with the crime on trial but

---

[21] The Supreme Court of Illinois, in considering its own rule which we are urged to adopt, recognized that "the rule adhered to in this State is not consistent with the great weight of authority in this country and in England." *People* v. *Hannon,* 381 Ill. 206, 209, 44 N. E. 2d 923. Authorities in all states are collected in 71 A. L. R. 1504.

by comparison with the reputation asserted that a court may judge whether the prior arrest should be made subject of inquiry. By this test the inquiry was permissible. It was proper cross-examination because reports of his arrest for receiving stolen goods, if admitted, would tend to weaken the assertion that he was known as an honest and law-abiding citizen. The cross-examination may take in as much ground as the testimony it is designed to verify. To hold otherwise would give defendant the benefit of testimony that he was honest and law-abiding in reputation when such might not be the fact; the refutation was founded on convictions equally persuasive though not for crimes exactly repeated in the present charge.

The inquiry here concerned an arrest twenty-seven years before the trial. Events a generation old are likely to be lived down and dropped from the present thought and talk of the community and to be absent from the knowledge of younger or more recent acquaintances. The court in its discretion may well exclude inquiry about rumors of an event so remote, unless recent misconduct revived them. But two of these witnesses dated their acquaintance with defendant as commencing thirty years before the trial. Defendant, on direct examination, voluntarily called attention to his conviction twenty years before. While the jury might conclude that a matter so old and indecisive as a 1920 arrest would shed little light on the present reputation and hence propensities of the defendant, we cannot say that, in the context of this evidence and in the absence of objection on this specific ground, its admission was an abuse of discretion.

We do not overlook or minimize the consideration that "the jury almost surely cannot comprehend the judge's limiting instruction," which disturbed the Court of Appeals. The refinements of the evidentiary rules on this

subject are such that even lawyers and judges, after study and reflection, often are confused, and surely jurors in the hurried and unfamiliar movement of a trial must find them almost unintelligible. However, limiting instructions on this subject are no more difficult to comprehend or apply than those upon various other subjects; for example, instructions that admissions of a co-defendant are to be limited to the question of his guilt and are not to be considered as evidence against other defendants, and instructions as to other problems in the trial of conspiracy charges. A defendant in such a case is powerless to prevent his cause from being irretrievably obscured and confused; but, in cases such as the one before us, the law foreclosed this whole confounding line of inquiry, unless defendant thought the net advantage from opening it up would be with him. Given this option, we think defendants in general and this defendant in particular have no valid complaint at the latitude which existing law allows to the prosecution to meet by cross-examination an issue voluntarily tendered by the defense. See *Greer* v. *United States,* 245 U. S. 559.

We end, as we began, with the observation that the law regulating the offering and testing of character testimony may merit many criticisms. England and some states have overhauled the practice by statute.[22] But the task of modernizing the long-standing rules on the subject is

---

[22] Criminal Evidence Act, 61 & 62 Vict., c. 36. See also 51 L. Q. Rev. 443, for discussion of right to cross-examine about prior arrests. For review of English and state legislation, see 1 Wigmore, *Evidence* (3d ed., 1940) § 194, *et seq.* The Pennsylvania statute (Act of March 15, 1911, P. L. 20, § 1) discussed by Wigmore has been amended (Act of July 3, 1947, P. L. 1239, § 1, 19 PS § 711). The current statute and Pennsylvania practice were considered recently by the Superior Court of that state. *Commonwealth* v. *Hurt,* 163 Pa. Super. 232, 60 A. 2d 828.

one of magnitude and difficulty which even those dedicated to law reform do not lightly undertake.[23]

The law of evidence relating to proof of reputation in criminal cases has developed almost entirely at the hands of state courts of last resort, which have such questions frequently before them.  This Court, on the other hand, has contributed little to this or to any phase of the law of evidence, for the reason, among others, that it has had extremely rare occasion to decide such issues, as the paucity of citations in this opinion to our own writings attests.  It is obvious that a court which can make only infrequent sallies into the field cannot recast the body of case law on this subject in many, many years, even if it were clear what the rules should be.

We concur in the general opinion of courts, textwriters and the profession that much of this law is archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counterprivilege to the other.  But somehow it has proved a workable even if clumsy system when moderated by discretionary controls in the hands of a wise and strong trial court.  To pull one misshapen stone out of the grotesque structure is more likely simply to upset its present balance between adverse interests than to establish a rational edifice.

The present suggestion is that we adopt for all federal courts a new rule as to cross-examination about prior arrest, adhered to by the courts of only one state and

---

[23] The American Law Institute, in promulgating its "Model Code of Evidence," includes the comment, "Character, wherever used in these Rules, means disposition not reputation. It denotes what a person is, not what he is reputed to be.  No rules are laid down as to proof of reputation, when reputation is a fact to be proved.  When reputation is a material matter, it is provable in the same manner as is any other disputed fact." Rule 304.  The latter sentence may seem an oversimplification in view of the decisions we have reviewed.

rejected elsewhere.[24]   The confusion and error it would engender would seem too heavy a price to pay for an almost imperceptible logical improvement, if any, in a system which is justified, if at all, by accumulated judicial experience rather than abstract logic.[25]

The judgment is

*Affirmed.*

Mr. Justice Frankfurter, concurring.

Despite the fact that my feelings run in the general direction of the views expressed by Mr. Justice Rutledge in his dissent, I join the Court's opinion.   I do so because I believe it to be unprofitable, on balance, for appellate courts to formulate rigid rules for the exclusion of evidence in courts of law that outside them would not be regarded as clearly irrelevant in the determination of issues.   For well-understood reasons this Court's occasional ventures in formulating such rules hardly encourage confidence in denying to the federal trial courts a power of control over the allowable scope of cross-examination possessed by trial judges in practically all State courts.   After all, such uniformity of rule in the conduct of trials is the crystallization of experience even when due allowance is made for the force of imitation.   To reject such an impressive body of experience would imply a more dependable wisdom in a matter of this sort than I can claim.

To leave the District Courts of the United States the discretion given to them by this decision presupposes a

---

[24] See note 21.

[25] It must not be overlooked that abuse of cross-examination to test credibility carries its own corrective.   Authorities on practice caution the bar of the imprudence as well as the unprofessional nature of attacks on witnesses or defendants which are likely to be resented by the jury.   Wellman, *Art of Cross-Examination* (1927) p. 167, *et seq.*

high standard of professional competence, good sense, fairness and courage on the part of the federal district judges. If the United States District Courts are not manned by judges of such qualities, appellate review, no matter how stringent, can do very little to make up for the lack of them.

MR. JUSTICE RUTLEDGE, with whom MR. JUSTICE MURPHY joins, dissenting.

The Court's opinion candidly and interestingly points out the anomalous features characterizing the exclusion and admission of so-called character evidence in criminal cases. It also for the first time puts the stamp of the Court's approval upon the most anomalous and, what is more important, the most unfair stage in this evidentiary sequence.

There are three stages. The first denies the prosecution the right to attack the defendant's reputation as part of its case in chief, either by proof of bad general reputation or by proof of specific derogatory incidents disconnected from the one charged as the crime. The second permits the defendant, at his option, to prove by qualified witnesses that he bears a good general reputation or at least one not tarnished by ill-repute. The witness is forbidden, however, to go into particular incidents or details of the defendant's life and conduct. The witness, once qualified, can state only the general conclusion of the community concerning the defendant's character as the witness knows that reputation. The third stage comprehends the prosecution's rebuttal, and particularly the latitude of cross-examination to be allowed.

I do not agree that this whole body of law is anomalous, unless indeed all the law of evidence with its numerous rules of exclusion and exceptions to them is to be so regarded. Anomalies there are, no doubt with much room

for improvement. But here, if anywhere, the law is more largely the result of experience, of considerations of fairness and practicability developed through the centuries, than of any effort to construct a nicely logical, wholly consistent pattern of things. Imperfect and variable as the scheme has become in the application of specific rules, on the whole it represents the result of centuries of common-law growth in the seeking of English-speaking peoples for fair play in the trial of crime and other causes.

Moreover, I cannot agree that, in the sequence of the three stages relating to character evidence, the anomalous quality is equally present in each. In my judgment there is a vast difference in this respect between the rulings summarizing our experience in the first two stages and those affecting the third.

Regardless of all considerations of mere logical consistency, I should suppose there would be few now, whether lawyers or laymen, who would advocate change in the prevailing rules governing the first two stages of the sequence. In criminal causes especially, there are sound reasons basic to our system of criminal justice which justify initially excluding the Government from showing the defendant's bad general character or reputation.

The common law has not grown in the·tradition of convicting a man and sending him to prison because he is generally a bad man or generally regarded as one. General bad character, much less general bad reputation, has not yet become a criminal offense in our scheme. Our whole tradition is that a man can be punished by criminal sanctions only for specific acts defined beforehand to be criminal, not for general misconduct or bearing a reputation for such misconduct.

That tradition lies at the heart of our criminal process. And it is the foundation of the rule of evidence which denies to the prosecution the right to show generally or by specific details that a defendant bears a bad general

estimate in his community. In the light of our funda-
mental conceptions of crime and of the criminal process,
there is nothing anomalous in this exclusion. It is de-
signed to restrain proof to the limits of the charge and
to prevent conviction for one offense because perhaps
others, or misconduct not amounting to crime at all,
have been perpetrated or are reputed generally to lie at
the defendant's door.

The rule which allows the defendant to prove his good
standing by general reputation is, of course, a kind of
exception to the hearsay rule of exclusion, though one
may inquire how else could reputation be proved than
by hearsay if it is to be proved at all. This indeed pre-
sents the substantial question. Apart from its long ac-
ceptance, *Edgington* v. *United States,* 164 U. S. 361,
the rule allowing the evidence to come in rests on very
different considerations from the one which forbids the
Government to bring in proof of bad public character
as part of its case in chief. The defendant's proof comes
as rebuttal. It is subject to none of the dangers involv-
ing the possibility of conviction for generally bad conduct
or general repute for it which would characterize permit-
ting the prosecution initially to show bad general repu-
tation. The basic reason for excluding the latter does
not apply to the defendant's tender of proof.

On the positive side the rule is justified by the ancient
law which pronounces that a good name is rather to be
chosen than great riches. True, men of good general
repute may not deserve it. Or they may slip and fall
in particular situations. But by common experience this
is more often the exception than the rule. Moreover,
most often in close cases, where the proof leaves one in
doubt, the evidence of general regard by one's fellows
may be the weight which turns the scales of justice. It
may indeed be sufficient to create a clear conviction of

innocence or to sow that reasonable doubt which our law requires to be overcome in all criminal cases before the verdict of guilty can be returned.

The apparent anomaly which excludes the prosecution's proof of bad character in the beginning but lets in the defendant's proof of good character is thus only apparent. It is part and parcel of our scheme which forbids conviction for other than specific acts criminal in character and which, in their trial, casts over the defendant the presumption of innocence until he is proved guilty beyond all reasonable doubt. To take away his right to bring in any substantial and pertinent proof bearing upon the existence of reasonable doubt is, so far, to nullify the rule requiring removal of that doubt. I reject the Court's intimation that these considerations have to some extent become obsolete or without substantial effects because we now live in cities more generally than formerly. They are basic parts of our plan, perhaps the more important to be observed because so much of our life now is urban.

But, for a variety of reasons, the law allows the defendant to prove no more than his general reputation, by witnesses qualified to report concerning it. He cannot show particular acts of virtue to offset the proof of his specific criminality on any theory that "By their fruits ye shall know them." Whether this be because such proof is irrelevant, is too distracting and time-consuming, is summarized in the general report of good character, or perhaps for all of these reasons, the rule is settled, and I think rightly, which restricts the proof to general repute.

Thus far, whatever the differences in logic, differences which as usual inhere in the premises from which thinking starts, there is no general disagreement or dissatisfaction in the results. All of the states and the federal judicial

system as well, approve them. No one would open the doors initially to the prosecution. No one would close them to the defense.

But the situation is different when we come to the third stage, that of the prosecution's rebuttal. Obviously rebuttal there should be, when the defendant has opened a line of inquiry closed to the prosecution and has sought to gain advantage by proof which it has had no chance to counteract. But the question of how the rebuttal shall be made presents the difficult problem.

There can be no sound objection, of course, to calling witnesses who will qualify as the witnesses for the defense are required to do, but who also will contradict their testimony. And the prosecution may inquire concerning the qualifications of the witnesses for the defense to speak concerning the defendant's general reputation. Thus far there is nothing to exceed the bounds of rebuttal or take the case out of the issues as made.

But these have not been the limits of proof and cross-examination. For, in the guise of "testing the standards of the witness" when he speaks to reputation, the door has been thrown wide open to trying the defendant's whole life, both in general reputation and in specific incident. What is worse, this is without opportunity for the defendant to rebut either the fact or the innuendo for which the evidence is tendered more generally than otherwise. Hardly any incident, however remote or derogatory, but can be drawn out by asking the witness who testifies to the defendant's good character, "Have you heard this" or "Have you heard that." And many incidents, wholly innocent in quality, can be turned by the prosecutor, through an inflection or tone, to cast aspersion upon the defendant by the mere asking of the question, without hope of affirmative response from the witness.

The dangers, the potential damage and prejudice to the defendant and his cause, have not been more clearly sum-

marized than in the excerpt from Wigmore's classic treatise, quoted in note 4 of the Court's opinion, *ante,* p. 473. His summary of the consequences produced by the rule bears repetition and greater emphasis. He said:

> "The rumor of the misconduct, when admitted, goes far, in spite of all theory and of the judge's charge, towards fixing the misconduct as a fact upon the other person, and thus does three improper things,— (1) it violates the fundamental rule of fairness that prohibits the use of such facts, (2) it gets at them by hearsay only, and not by trustworthy testimony, and (3) it leaves the other person no means of defending himself by denial or explanation, such as he would otherwise have had if the rule had allowed that conduct to be made the subject of an issue." 3 Wigmore, Evidence (3d ed., 1940) § 988.

These consequences are not denied. But it is said two modes of protection are available to the accused. One is to refrain from opening the inquiry into his reputation. That answer would have weight if the rebuttal were limited to inquiry concerning the witness' opportunity for knowing the accused and his reputation and to producing contrary evidence by other witnesses of the same general sort as that which is refuted. But if the rule is sound which allows the accused to show his good repute and restricts him to that showing, it not only is anomalous, it is highly unjust, to exact, as the price for his doing so, throwing open to the prosecution the opportunity not only to rebut his proof but to call in question almost any specific act of his life or to insinuate without proving that he has committed other acts, leaving him no chance to reply. A fair rule either would afford this chance or would restrict the prosecution's counterproof in the same way his own is limited. The prevailing rule changes the whole character of the case, in a manner the rules applying to the two earlier stages seek to avoid.

Nor is it enough, in my judgment, to trust to the sound discretion of trial judges to protect the defendant against excesses of the prosecution. To do this effectively they need standards. None are provided under the Court's ruling; indeed it would be difficult to provide them except for each case and question as they might arise.

The facts in this case, it seems to me, show the inadequacy of any such general and largely unrestricted delegation. They demonstrate how far and how unfairly the prosecution may be allowed to go in bringing extraneous and immaterial matters to the jury's attention, with however a probable effect of prejudice. Petitioner himself had made a clean breast of his twenty-year-old conviction for violating the New York trademark laws. That fact of course was of some use for testing his character witnesses' standards for speaking to his general repute, although the conviction was so old that conceivably it could have but little weight on the accused's reputation in 1947.

Then the prosecution went back seven years further and inquired whether the witnesses had heard that petitioner was arrested "on October 11th, 1920" for receiving stolen goods. None of the witnesses had heard of this fact. The court solemnly instructed the jury that they were not to consider that the incident took place, that all that was happening was that the prosecutor was testing the witness' standard of opinion of the accused's reputation. This, after the court out of the jury's presence had required the prosecutor to make proof satisfactory to the court that the incident had taken place.

The very form of the question was itself notice of the fact to the jury. They well might assume, as men of common sense, that the court would not allow the question if the fact were only fiction. And why "on October 11th, 1920," rather than merely "in 1920" or "Have you ever heard of the defendant's being arrested, other than

for the trademark violation?" Why also "for receiving stolen goods"? In my opinion the only answers to these questions are, not that the prosecution was "testing the witness' standard of opinion of reputation," but that it was telling the jury what it could not prove directly and what the petitioner had no chance to deny, namely, that he had been so arrested; and thereby either insinuating that he had been convicted of the crime or leaving to the jury to guess that this had been the outcome. The question was a typical abuse arising from allowing this type of inquiry. It should have been excluded. There is no way to tell how much prejudice it produced.

Moreover, I do not think the mere question of knowledge of a prior arrest is one proper to be asked, even if inquiry as to clearly derogatory acts is to be permitted. Of course men take such an inquiry as reflecting upon the person arrested. But, for use in a criminal prosecution, I do not think they should be allowed to do so. The mere fact of a single arrest twenty-seven years before trial, without further showing of criminal proceedings or their outcome, whether acquittal or conviction, seldom could have substantial bearing upon one's present general reputation; indeed it is not *per se* a derogatory fact. But it is put in generally, and I think was put in evidence in this case, not to call in question the witness' standard of opinion but, by the very question, to give room for play of the jury's unguarded conjecture and prejudice. This is neither fair play nor *due* process. It is a perversion of the criminal process as we know it. For it permits what the rule applied in the first stage forbids, trial of the accused not only for general bad conduct or reputation but also for conjecture, gossip, innuendo and insinuation.

Accordingly, I think this judgment should be reversed. I also think the prevailing practice should be changed.

One judge of the Court of Appeals has suggested we do this by adopting the Illinois rule,[1] namely, by limiting inquiry concerning specific incidents to questions relating to prior offenses similar to that for which the defendant is on trial. Logically that rule is subject to the same objections as the generally prevailing one. But it has the practical merit of greatly reducing the scope and volume of allowable questions concerning specific acts, rumors, etc., with comparable reduction of innuendo, insinuation and gossip. My own preference and, I think, the only fair rule would be to foreclose the entire line of inquiry concerning specific incidents in the defendant's past, both on cross-examination and on new evidence in rebuttal. This would leave room for proper rebuttal without turning the defendant's trial for a specific offense into one for all his previous misconduct, criminal or other, and would put the prosecution on the same plane with the defendant in relation to the use of character evidence. This, it seems to me, is the only fair way to handle the matter.

---

[1] See *People* v. *Hannon,* 381 Ill. 206, 211, for the most recent statement of the rule established by *Aiken* v. *People,* 183 Ill. 215; cf. *People* v. *Page,* 365 Ill. 524. In North Carolina a character witness may be asked on cross-examination about the "general reputation of the defendant as to particular vices or virtues," but not about rumors of specific acts of misconduct. *State* v. *Shepherd,* 220 N. C. 377, 379; *State* v. *Holly,* 155 N. C. 485, 492. The Arizona Supreme Court, which once followed the rule adopted by the Court today, *Smith* v. *State,* 22 Ariz. 229, more recently, in reversing a judgment because a character witness was cross-examined as to his knowledge of specific acts of misconduct, stated that cross-examination should be limited to questions concerning the source of the witness' knowledge of the accused's reputation and should not include questions concerning specific acts of misconduct. *Viliborghi* v. *State,* 45 Ariz. 275, 285.