**UNITED STATES of America,
Appellee,**

v.

**Norbert Nisan KAHAN and Bertha Limo
Newman, Appellants.**

**Nos. 706, 707, Dockets 72–2333, 73–1012.**

United States Court of Appeals,
Second Circuit.

Argued March 22, 1973.

Decided May 16, 1973.

Rehearing Denied July 9, 1973.

Mansfield, Circuit Judge, concurred in part and dissented in part and filed opinion.

Lawrence Stern, New York City, for appellant Newman.

Jesse Berman, New York City, for appellant Kahan.

Robert Walton, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, Rudolph W. Giuliani and John W. Nields, Jr., Asst. U. S. Attys., of counsel), for appellee.

Before SMITH, FEINBERG and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Norbert Kahan and Bertha Newman were convicted on trial to the jury in the Southern District of New York (Constance Baker Motley, Judge), of conspiracy, bribery and falsifying visa extension applications. Kahan was also convicted of perjury before the grand jury. Both appeal. Kahan challenges his conviction on grounds of (1) improper striking of character evidence, (2) failure by the jury to consider each count separately, and (3) use in the government's direct case of Kahan's statements made while requesting appointed counsel as violative of his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel. Newman contends that the government failed to establish by clear and convincing evidence an independent source for an in-court identification made subsequent to an improper showup and that the court improperly limited her impeachment of the government's witnesses. For the reasons set forth below, we reverse Kahan's conviction and affirm Newman's.

The principal charge involved a scheme to use Kahan's position as an Immigration inspector to obtain monies from non-resident aliens for improper extension of their visa permits. Aliens who in many cases could not speak English went to Newman who filled out their application papers, took $100 in excess of the normal application fee, and later returned an extended visa. Sixteen of those who had sought Newman's services testified at trial to the falsity of New-

292

man's entries on the applications as set forth in the margin.[1]

The evidence against Kahan was also extensive, although circumstantial.[2]

■ Kahan's third claim of error raises the most substantial question. At arraignment Kahan stated that he was without assets and in need of appointed counsel. These statements were used against him on trial in the government's case in chief. Use of Kahan's false claims of lack of assets was claimed to be violative of his right against self-incrimination and right to counsel. We agree. United States v. Branker, 418 F. 2d 378, 380 (2d Cir. 1969); see Mc-

Gautha v. California, 402 U.S. 183, 239, 91 S.Ct. 1454, 28 L.Ed. 711 (1971) (Douglas, J., dissenting). The government's claim that the privilege does not extend to false statements is not well taken. The ultimate truth of the matter asserted in the pre-trial request for appointed counsel is of no moment. See Simmons v. United States, 390 U.S. 377, 393, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). A defendant should not be forced to gamble his right to remain silent against his need for counsel or his understanding of the requirements for appointment of counsel.[3] Nor does the mere fact that Kahan's statements were not made under oath take them without

1. They stated that Newman filled out the application, that she had not read to them, nor could they read for themselves, the answers she filled in. They further testified that certain answers as made known to them subsequently had no basis in truth nor in any information that they had given to Newman. There was evidence that Newman in fact knew that the answers were false and used answers that were required for an extension.

2. No alien testified to any dealings with Kahan. The sole direct testimony linking Kahan to Newman's scheme was Inspector Piccirillo's testimony that he had seen Newman and Kahan meet twice while he was surveilling Kahan; once on April 13, 1971 and again on April 19, 1971. At the first meeting which took place about five o'clock, the officer saw appellants meet, go into a restaurant, and Kahan depart as he took money out of an envelope and put it into his wallet. At the second meeting Piccirillo observed the entire meeting of the two which lasted about twenty minutes. There was also evidence that Newman had attempted to visit Kahan at work. When questioned by Conely, Kahan's supervisor, Newman lied to him about her purpose for visiting and slipped away.

Newman told one of the alien applicants when he asked why the fee was a hundred dollars, that she had to pay part of it to a friend in Immigration. Newman told another applicant the fee would be $140 because ". . . I have to split it with somebody there (Immigration office) and this man don't want anymore $50." While the usual procedure for filing an application took 30–45 minutes, Mrs. Newman on several occasions needed substantially less time to get the application

approved by Kahan. Search of Newman's apartment, after an interview with the FBI during which she denied having prepared any more than six applications or accepting money for assistance in preparing the forms, turned up a box filled with Immigration forms and a looseleaf binder containing 178 carbon copies of I–539 forms. One hundred fifty-five of these applications had been approved by Kahan, a far higher proportion than would be expected in view of the number of inspectors passing on such forms. Kahan's supervisor had discovered that he had been adjudicating I–539's not assigned to him. A year later after having been instructed not to handle any more walk-in I–539's and not to speak to any alien, Kahan approved two more applications both prepared by Newman.

Kahan's bank statement and income tax returns indicated that Kahan had banked all but $500 of his reported income for the year 1970 and $2000 more than his reported adjusted gross income in 1971. Statements of his lack of funds made at arraignment in the context of request for appointed counsel were introduced as evidence of similar acts to the perjury charged and as false exculpatory statements evincing consciousness of guilt. Kahan at the time he made this misrepresentation had access to several Totten trusts totaling more than $25,000.

3. Here Kahan claims not to have understood that assets held in a Totten trust were his. If there has been willful misrepresentation by defendant of his assets, proper remedy lies in prosecution for perjury or false statement and the recovery from him ordered here by the court of counsel fees and expenses improperly paid on his behalf.

the protection of the Fifth Amendment. Addressed by the court as to his financial assets, defendant was required to speak in order to obtain appointed counsel. *Cf.* Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 615–616, 34 L.Ed.2d 548 (1973).

■ The government urges us to hold any error there might be in admitting Kahan's exculpatory statements harmless. We must decline. Here, as the government admits, the evidence against Kahan was entirely circumstantial. Credibility was an essential factor, especially as two counts of the indictment charged the defendant with perjury.[4] Not only did the prosecution introduce the statements in its direct case and argue them in summation, the court also focused on these statements in its instructions to the jury.[5] As there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is required. *See* Schneble v. Florida, 405 U.S. 427, 430–431, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

■ Kahan's two other claims of prejudicial error are without merit. Appellant offered the testimony of one of the directors of his synagogue as to his good character; the testimony was stricken on the grounds that it was not proper character evidence and that the witness was not shown to be sufficiently acquainted with the defendant. Under the prevailing view character evidence must be based solely on reputation in the community; it must be hearsay and cannot be based on the witness' own personal assessment of the defendant or on specific acts reflecting certain qualities. Michelson v. United States, 335 U.S. 469, 477, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Here the witness stated that he had never discussed nor heard discussion of defendant's reputation as far as truth and veracity because " . . . his actions show that he was a man of truth, veracity, integrity, and I think he's one of the best liked men in the synagogue." Kahan also attempted to bring in through this witness evidence of refusal by him to help the witness through Kahan's position with the Immigration agency, evidence clearly precludable under *Michelson*. *See* United States v. Beno, 324 F.2d 582, 587 (2d Cir. 1963).

■■ Prior to introducing character testimony defendant must establish the witness' acquaintance with defendant, the community and his circle of acquaintances. The court properly ruled that a witness who did not know enough about defendant to be aware of defendant's occupation lacked sufficient knowledge of defendant.[6]

---

4. Kahan's defense was his own testimony denying the government's allegations and the testimony of a character witness.

5. "Now, the Government has tendered evidence which it claims shows acts by Mr. Kahan similar to the ones charged in the perjury count.

Mr. Kahan is not on trial for events relating to these similar acts; that is, the statements which he made to the Court at the time of his arraignment regarding his ability to secure a lawyer of his own choosing with his own funds.

You may, however, consider, in determining whether the defendant acted with guilty knowledge or unlawful attempt on the charges of perjury before you, the fact, if you find it to be true, that he engaged in other similar acts to those charged in those perjury indictments.

You are to consider that evidence as to what he said on the arraignment regarding his finances on the question of knowledge and intent only when you are considering the perjury charges made against him in this indictment.

Now, again with respect to that particular evidence, that is, the statements made by Mr. Kahan on his arraignment regarding his finances, there is another principle of law applicable here and that is that conduct of a defendant, including statements which are knowingly made by him upon being informed that a crime has been committed, or that he has been accused of a crime, may be considered by the jury in the light of all other evidence in the case."

6. "Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse

■ Appellant's claim that the jury's guilty finding on several counts of the indictment that had been stricken demonstrated that it had failed to consider each count separately and thus required a new trial is also without merit.[7] The jury answered as to each count and was clearly instructed that it must determine guilt beyond a reasonable doubt on each count.[8] It did in fact acquit Kahan on two counts. There is neither ambiguity in the verdict rendered, Glenn v. United States, 137 U.S.App.D.C. 120, 420 F.2d 1323 (D.C.Cir.1969), nor is the verdict an "inaccurate and insufficient hotchpotch. . . ." United States v. DiMatteo, 169 F.2d 798 (3d Cir. 1948). Where separate verdicts are given on each count pursuant to specific instructions to find guilt separately on each count, conviction on all counts is not necessarily negatived by error affecting only one or several of numerous counts. Here, where 67 counts were before the jury the error was, in the words of defense counsel at trial, merely an "oversight," properly corrected as to the stricken counts without affecting the validity of the remaining counts.

■ Newman challenges the court's finding that the government had proved by clear and convincing evidence that Inspector Piccirillo's in-court identification was based on a source independent of a wrongful showup. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967); see, e.g., United States ex rel. Rivera v. McKendrick, 474 F.2d 259 (2d Cir., 1973). Piccirillo, engaged in surveillance of Kahan, testified that while so occupied he had twice observed Newman meeting Kahan. On both occasions the meetings were in daylight, or bright night, and Piccirillo came within several feet of the defendants during the meetings. Each observation was approximately twenty minutes in duration. Notes taken at the time of the meetings indicate that Kahan had met a woman who stood about shoulder high to Kahan, was fair, stocky and had long reddish dyed hair—more black than red. The description fits Newman.

The unlawful showup occurred six months after the observation. Piccirillo looked in a room for several seconds where Newman was sitting and indicated that she was the woman he saw meet Kahan. While Piccirillo did not link Newman with a photograph of her given him prior to the meeting it appears that the photograph was old, black and white, that it showed only her face and that she had a different hairstyle. Apparently it is appellant's physical stature that is distinctive, a factor not clearly shown in the picture. Piccirillo had observed another woman and specifically found her not to be the woman in the photograph; he did not make a similar finding as to Newman. The finding of an absence of a taint from the showup is fully supported by the record.[9]

■ The court's limiting of impeachment by the defense of alien witnesses as to questions concerning prior convictions and a prior inconsistent statement was not error. As a general rule a witness' acts of misconduct are not admissible to impeach his credibility unless the acts result in a conviction.

of discretion will Courts of Appeals disturb rulings of trial courts on this subject." Michelson v. United States, 335 U.S. 469, 480, 69 S.Ct. 213, 221 (1948).

7. Counts of the indictment were separated for each alien application. The counts stricken were those as applied to particular applicants.

8. "The Government's failure to establish beyond a reasonable doubt any one of the three elements of the crime of receiving an unlawful gratuity as to any count must result in Mr. Kahan's acquittal of that charge.

On the other hand if you find that the Government has established beyond a reasonable doubt each essential element as to a particular count, then you may convict Mr. Kahan of that particular count."

9. Cf. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); United States ex rel. Gonzalez v. Zelker, 477 F.2d 797 (2d Cir., 1973).

United States v. Sposato, 446 F.2d 779, 780–781 (2 Cir. 1971). So far as the offer was of criminal activity as bearing on likelihood of lying solely because other criminal acts had been done, the limitation imposed was proper. *See* United States v. Kahn and Teleprompter, 472 F.2d 272, 279–280 (2d Cir. 1973). Here, the court's limitation, such as it was, was imposed only after twelve of the sixteen witnesses had been questioned as to their deliberate falsifying of statements on visa applications. Witnesses who testified subsequent to the limitation testified that their presence in the United States was illegal. So far as the facts indicated a motive to lie to curry favor with the government by law violators they were quite fully developed before the jury.

We find no error on Newman's appeal and affirm her conviction.

We reverse and remand for retrial as to Kahan.

MANSFIELD, Circuit Judge (concurring in part and dissenting in part):

I concur in Judge Smith's thorough and thoughtful opinion except as to his conclusion that it was reversible error to have admitted into evidence Kahan's pretrial statement, made in support of his application for appointment of counsel pursuant to the Criminal Justice Act, that he was without funds. Since I disagree with this conclusion, I would affirm the judgment as to both defendants.

It is settled that an accused's self-incriminatory testimony, given at a pretrial hearing in support of his application for enforcement of his Fourth or Sixth Amendment rights may not later be admitted against him at trial as part of the government's case. Simmons v. United States, 390 U.S. 377, 389–394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. Branker, 418 F.2d 378, 380 (2d Cir. 1969).[1] To hold otherwise would be to deter a defendant from the assertion of his lawful constitutional rights. In the words of Justice Harlan, speaking for a 6 to 2 majority in *Simmons, supra,* the accused would be "obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." Absent a rule barring the government's use on its direct case of the accused's self-incriminatory statements,

---

1. In *Simmons* the defendant, who was charged with armed robbery, moved to suppress the introduction at trial of a suitcase containing a gun holster and several items that had been taken from the bank at the time of the robbery as violative of his Fourth Amendment rights. Justice Harlan stated:

"The only, or at least the most natural, way in which he could found standing to object to the admission of the suitcase was to testify that he was its owner. Thus, his testimony is to be regarded as an integral part of his Fourth Amendment exclusion claim. . . . Testimony of this kind, which links a defendant to evidence which the Government considers important enough to seize and to seek to have admitted at trial, must often be highly prejudicial to a defendant. This case again serves as an example, for Garrett's admitted ownership of a suitcase which only a few hours after the robbery was found to contain money wrappers taken from the victimized bank was undoubtedly a strong piece of evidence against him. Without his testimony, the Government might have found it hard to prove that he was the owner of the suitcase.
   \*     \*     \*     \*     \*
"In such circumstances, a defendant with a substantial claim for the exclusion of evidence may conclude that the admission of the evidence, together with the Government's proof of linking it to him, is preferable to risking the admission of *his own testimony connecting himself with the seized evidence.*" (Emphasis added) 390 U.S. at 391, 393, 88 S.Ct. at 975.

In *Branker* the defendant was convicted after a retrial of knowingly participating in a scheme to defraud the government by obtaining false tax refunds. At an indigency hearing held after the first trial in connection with his application to appeal *in forma pauperis* he admitted, after first denying that he had received for his personal use any of the refunds, that he had received small amounts out of refund checks cashed by him for others.

he would be able to give essential testimony only at the risk that damaging admissions would then be used to convict him at trial.

But when an accused decides to use perjury or false statements as a means of claiming a right (to which he might not be entitled if he told the truth) he faces no such dilemma or Hobson's choice. The salutary rule of *Simmons*, as extended by *Branker* to the exercise of Sixth Amendment rights, was founded on the principle that an accused should not be deterred from telling the truth at a pretrial hearing even though it would involve admissions of an incriminating nature. No legitimate interest is protected by extending the rule to outright perjury or falsification. The latter should carry all of their nor-

mal sanctions, including the admission at trial of the accused's demonstrably false statements wherever they would otherwise be relevant.[2] It is unnecessary to grant him a license to falsify in order to protect his exercise of his pretrial constitutional rights.

Applying these principles here, Kahan's volunteered representation to the court, upon his application for appointed counsel, that he was indigent and had "no current funds" when he had in fact accumulated approximately $27,000 in four bank accounts over which he had exclusive control not only deceived the court but amounted to a false exculpatory statement. United States v. McConney, 329 F.2d 467, 470 (2d Cir. 1964).[3] The proof showed that, assuming he had spent nothing during the

2. Normally the fact that a defendant may be prosecuted for perjury based on his willful giving of materially false testimony does not preclude the government from offering into evidence his prior false statements where they are relevant and probative with respect to issues, e. g., knowledge, intent, consciousness of guilt. As with all other prejudicial evidence offered by the government, the defendant is protected by obtaining from the court, out of the jury's presence, a preliminary ruling as to the falsity of the earlier statement and its relevance to the issues on trial, which was the course followed by Judge Motley. Indeed she further found that the prejudicial effect of Kahan's statement did not outweigh its probative value.

3. Kahan's pertinent statement to the court was as follows:
"The Court: Your name, sir?
"The Defendant: I am Norbert Kahan, sir.
"The Court: Have you an attorney?
"The Defendant: No, sir.
"The Court: Have you any money to hire an attorney?
"The Defendant: I do, sir, but it's blocked by my wife from whom I am divorced.
"The Court: Do you want a week to try and straighten that out?
"The Defendant: There is a suit coming up sometime early next year.
"The Court: We can't wait until next year.
"The Defendant: Then if it pleases the Court I would like to have the Court assign me an attorney.

"The Court: You have no current funds?
"The Defendant: I beg your pardon?
"The Court: You have no current funds at all?
"The Defendant: No sir.
"The Court: Are you working?
"The Defendant: No, sir.
"The Court: I'm going to assign Mr. Jesse Berman at this point."
Following a conference in the court room with his new client regarding his "financial status," Mr. Berman reported to the court, on the basis of what Kahan had just told him, that Kahan "has no savings account in any bank in his own name. He had a joint account with his wife but since their divorce she has control of that account and he very strongly offers to reimburse the government should he be successful in his lawsuit against his ex-wife in the control of that account but at the present time he has no money."

Although Kahan contended at trial that he understood that the Totten savings accounts opened up by him belonged to his children, with himself merely the custodian, Judge Motley properly ruled that there was sufficient proof of falsity to warrant admission of Kahan's statement. It is beyond dispute that if Kahan, upon his arraignment, had disclosed the accounts rather than throw the court off the track by referring to the blocked account in dispute with his wife, denial of assignment of counsel under the Criminal Justice Act would have been mandated.

years 1970 and 1971, he had deposited more money in these accounts ($27,000) than his entire legitimate income ($25,000) as reported by him on his tax returns. Evidence to that effect was properly received as the basis for an inference that he received some of the money paid by non-resident aliens to Mrs. Newman to obtain Kahan's approval of their falsified applications for extension of the length of their stay in the United States.

It furthermore appears that, aside from Kahan's false statement to the court as to his finances, which covers but 2½ pages out of a total trial transcript in excess of 2,000 pages, the other evidence against him was overwhelming. See majority opinion, *supra* n.2. There was eye-witness testimony of meetings between Kahan and Mrs. Newman, from one of which he was seen to exit, take an envelope out of his pocket, remove money from the envelope and place the money in his wallet. Of 178 copies of INS Form I–539 (Alien's Application to Extend Time of Temporary Stay) found in Mrs. Newman's apartment, 155 had been approved by Kahan. With six full-time inspectors and fourteen part-time inspectors working on such matters at the INS New York office, the chances are infinitesimal that if these 178 applications had been processed in the usual course of business, 87% of them would have been handled by Kahan. Furthermore, one of the forms found in Mrs. Newman's apartment bore Kahan's initials, from which it could reasonably be inferred that after approving it he had in violation of INS procedures returned it to Mrs. Newman. In addition there were Kahan's deposits during the period 1970–71 of approximately $27,000 in accounts controlled by him, which was more than his reported adjusted gross income during the period and could not be satisfactorily explained as coming from legitimate sources.

Assuming that Kahan, upon retrial, decides to take the witness stand in his own defense, his false statement to the district court as to his lack of money will probably be admissible to impeach his testimony, see Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), or as a false exculpatory statement, even though, according to the majority, it was error to have admitted the statement as part of the government's direct case at the first trial. If, on the other hand, Kahan decides not to take the witness stand, the overwhelming case against him will stand virtually unrebutted. Under the circumstances, even assuming *arguendo* that the admission of his pretrial statement was error, it was harmless beyond a reasonable doubt. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1967); Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

For the foregoing reasons I would affirm Kahan's conviction.