UNITED STATES of America,
Plaintiff-Appellee,

v.

Morris R. BLANE, Defendant-Appellant.

No. 16737.

United States Court of Appeals
Sixth Circuit.

April 8, 1967.

James J. Carroll, and John R. Jewitt, Jewitt & Jewitt, Cleveland, Ohio, for appellant.

Dominic J. Cimino, Asst. U. S. Atty., Cleveland, Ohio, for appellee, Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, on brief.

Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and TAYLOR, District Judge.

O'SULLIVAN, Circuit Judge.

This is an appeal by Morris R. Blane from a judgment of the United States District Court for the Northern District of Ohio, entered upon a jury verdict finding him guilty of bankruptcy fraud as charged in four counts of a five count indictment. Blane is a Cleveland lawyer,

specializing in bankruptcy practice. He acted as attorney for the Sterling Jewelry and Appliance Company, Inc., of Cleveland at the time of, and prior to, that company's filing of a petition on August 30, 1961, for an arrangement of debts under Chapter XI of the Bankruptcy Act, and its subsequent adjudication of bankruptcy on October 16, 1961.

Counts I and II charged generally that Blane, in contemplation of his client's bankruptcy, had obtained from Sterling described jewelry and other assets and transferred and concealed the same from the trustee in bankruptcy, in violation of 18 U.S.C. § 152. Blane was acquitted of Count III. Count IV charged Blane with conspiring (in violation of 18 U.S.C. § 371) with the president of the bankrupt, Harold I. Slote, to violate 18 U.S.C. § 152 by seeking out various suppliers for Sterling and ordering from them merchandise that would not be paid for, and that would be concealed during bankruptcy proceedings in recently acquired warehouses; it was further charged under this count that Blane would "retain and conceal unto himself assets and property purchased in pursuance of the conspiracy" with intent to defraud the creditors of Sterling after the company went into bankruptcy. Count V charged Blane with conspiring with the said bankrupt's president Slote to use the United States mails to further their fraudulent scheme and purpose, in violation of Section 371 (conspiracy) and Section 1341 (mail fraud) of 18 U.S.C.[1]

Appellant does not question the sufficiency of the proofs introduced at the trial to allow the jury to find him guilty beyond a reasonable doubt. The evidence indicated the following: In January, 1961, Sterling Jewelry and Appliance Company of Cleveland was unable to pay its debts, which then totaled about $62,-000. Appellant, a lawyer specializing in bankruptcy matters, was consulted. Under his advice and guidance, Slote, president of bankrupt, set about to buy large

quantities of new merchandise, notwithstanding his company's perilous financial condition, with the result that between January 1961, when Blane was employed, and the time the bankruptcy proceedings were instituted in August and October of the same year, the Sterling Jewelry Company's accounts payable rose from $62,-000 to approximately $175,000. At Blane's suggestion and with his cooperation this merchandise was not paid for and some of it was concealed from the bankruptcy court. There was evidence that Blane took and kept out of the bankrupt's stock a diamond engagement ring, two pearl chokers, a clasp and pin combination of diamonds and pearls, and a pair of binoculars and case; these items were not scheduled as part of the bankrupt's assets, as required by law.

We affirm the District Court judgment and will discuss appellant's citations of error as follows:

### 1) Cross-examination of character witnesses.

Two of defendant's character witnesses were asked upon cross-examination whether they had read any newspaper articles concerning appellant and whether such articles were considered by them in their evaluation of Mr. Blane's reputation. Parts of that cross-examination we set out in Appendix A. Defendant's attorneys objected to the line of questioning developed by the prosecution, and moved for a mistrial. In denying the motion, the District Judge said to counsel, in part:

"I have suggested that I thought it would have been proper if a witness had disclosed there were rumors. I think it proper for the Government to ascertain of any character witness whether or not he has heard rumors. I believe that this properly embraces the reading of a newspaper.

"But I have suggested I wouldn't allow that inquiry to go any further than to ask such a witness whether or not the

---

1. Harold Slote pleaded guilty to charges which involved him in the same criminal enterprise as was the subject of the indictment of appellant Blane. He testified for the government at Blane's trial.

rumors, or this article, became a part of the discussion between the witness on the stand and the people from whom he states he has obtained Mr. Blane's reputation.

He then spoke to the jury as follows:

"The Court: At this time, ladies and gentlemen, I wish to comment upon and instruct you regarding the witnesses who have appeared to give testimony as to reputation of the defendant, Mr. Blane.

"The Defendant has offered testimony of witnesses as to general reputation of the Defendant for truth and veracity or honesty and integrity.

"Later in my general instructions I will instruct you further upon this subject, however, at this time I instruct you that since the Defendant has offered witnesses to prove his good name, it is permissible and proper for the prosecution to cross examine these witnesses to test the sufficiency of the witnesses' knowledge to determine if they are qualified to give an opinion by inquiry into the extent of the acquaintance of the witnesses with the Defendant, the community in which he has lived, and the circles in which he has moved, so that the Court and jury can determine if the witnesses are qualified to speak with authority of the terms in which generally the Defendant is regarded.

"Although the prosecution has asked the witnesses certain questions, there is no proof in this case as to the content of any rumors concerning the reputation of Mr. Blane, nor of the contents of any newspaper articles concerning Mr. Blane.

"Therefore, you are not permitted to draw any inference or assumption as to contents of any rumors or newspaper articles from the questions asked by the prosecution of the character witnesses.

"The cross examination by the prosecution of the character witnesses is limited to testing the sufficiency of the opinions of the witnesses as to general reputation of the Defendant and can be considered by you only in determining what weight you shall give to the testimony of the character witnesses."

▇ We are of the view that the accused rulings of the District Judge were, in their context, an exercise of discretion which was not abused. In affirming him there would be little profit in our attempting meticulous analysis or distinction of the recited cross-examination vis-a-vis cross-examinations in other cases which have been held to be impermissible. Compare, e. g., Pittman v. United States, 42 F.2d 793, 795–798 (CA 8, 1930); United States v. Phillips, 217 F.2d 435, 443, 444 (CA 7, 1954). This much should be said, however: the specific contents of any newspaper report were not disclosed and we discern no government effort to do so; and the jury was carefully warned that the prosecution's questions could only be used to test whether the witnesses' avowed familiarity with the defendant's reputation was broad enough to include an awareness that reports of certain incidents, derogatory of that reputation, had been carried in the newspapers. Newspaper accounts may be as much a part of a community's thinking regarding the reputation of an individual as rumors and suspicions that circulate orally among his neighbors and associates. To the extent that Sloan v. United States, 31 F.2d 902, 905, 906 (CA 8, 1929), appears to hold differently, we advise our disagreement with its conclusion. We consider that the legitimate scope of the cross-examinations here involved was a matter for the trial judge's discretion. See Mannix v. United States, 140 F.2d 250, 251 (CA 4, 1944). It would be presumptuous for us to attempt improvement on the learned dissertation of the subject by Mr. Justice Jackson in the majority opinion in Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); he said, in part, therein:

"Both propriety and abuse of hearsay reputation testimony, on both sides,

depend on numerous and subtle considerations, difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject." 335 U.S. at 480, 69 S.Ct. at 221, 93 L.Ed. at 176.

Having in mind the content of the accused cross-examinations and the District Judge's careful admonition to the jury as to the limits to their consideration of them, we are satisfied that he acted discreetly.

### 2) Alleged error in denial of request for instruction.

In his request for instruction No. 3, which was denied by the District Court, appellant set out at length his theory of defense. Therein he recited, relevant to the charge of his obtaining, transferring and concealing certain jewelry and other assets of the bankrupt, his claim that he had received these items as payments on account of attorney fees for the services he rendered or would render to his client, Sterling Jewelry and Appliance Company. The request would have told the jury that attorney fees could be paid in property as well as cash; that even though payment of attorney fees for services not germane to, or in anticipation of, bankruptcy within four months of bankruptcy might be a preference, it would not thereby be a criminal offense; that if attorney's fees were paid in property or money for services rendered or to be rendered, in contemplation of bankruptcy, such payments were sanctioned by the Bankruptcy Act, subject to re-examination as to their reasonableness, and were not criminal offenses. Further expatiation of the circumstances under which Blane's acquisition of the bankrupt's property could be viewed as non-criminal was set out in varying repetitive styles. In our view, part of the refused request misstated the law, but for our holding we may assume that it did not do so.

In a criminal case, it is reversible error for a trial judge to refuse to present adequately a defendant's theory of defense, especially where a proper request therefor is proffered. Bird v. United States, 180 U.S. 356, 361, 21 S.Ct. 403, 45 L.Ed. 570, 573 (1901); Hendrey v. United States, 233 F. 5, 18 (CA 6, 1916); Marson v. United States, 203 F. 2d 904, 912 (CA 6, 1953); Levine v. United States, 104 U.S.App.D.C. 281, 261 F.2d 747, 748, 749 (1958). It is not required, however, that the exact language of a request be given, if the charge as a whole adequately covers the theory of the defense. Sugarman v. United States, 249 U.S. 182, 185, 39 S.Ct. 191, 63 L.Ed. 550 (1919); Henderson v. United States, 218 F.2d 14, 18, 50 A.L.R.2d 754 (CA 6, 1955), cert. den. 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 rehearing denied 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290; Ridenour v. United States, 14 F.2d 888, 892 (CA 3, 1926).

Relevant to the subject matter of appellant's request No. 3, the District Judge did charge:

"Four essential elements are required to be proved in order for you to find the Defendant guilty as charged in count 1 of the indictment. If even one of these elements is not proved, then you must find the Defendant not guilty; First, you must find that there was an estate in bankruptcy as charged; second, you must find that one or more of the items of property described in the indictment properly belonged to the estate of the bankrupt as alleged; third, that the Defendant, individually or as an aider and abettor, concealed said property and assets from the Trustee in bankruptcy, as charged; and fourth, you must find that the Defendant did such act or acts knowingly and fraudulently.

\* \* \* \* \* \*

"It is no defense that the concealment may have proved unavailing. Even though the entire amount of the property allegedly concealed may be recovered for the bankrupt estate, the Defendant may nonetheless be guilty. The offense alleged in count 1 of the indictment is complete if the Defendant knowingly and with fraudulent in-

tent concealed any of the bankrupt's property of value from the Trustee in bankruptcy as charged.

"You will bear in mind that the accused is not here on trial because the bankrupt failed to pay his debts. The law does not impose upon any corporation a restraint upon its right to spend money or otherwise dispose of property in good faith while indebted to others. Thus, at any time prior to the filing of a petition in bankruptcy, a corporation may pay one creditor and not others, thus preferring one creditor over another, or may gamble, give away, or otherwise relinquish to others money or property in its possession or under its control; or may wisely or foolishly dissipate its money or property prior to bankruptcy, and such acts do not constitute a crime against the Bankruptcy laws of the United States.

"An attorney at law, representing a corporation in financial difficulty, is entitled to contract for and receive fees in compensation for services rendered or to be rendered. It is not unlawful for a corporation expecting to file a voluntary petition in bankruptcy, or expecting that creditors will petition against it, to retain an attorney for the purposes of such proceedings, and to pay the attorney in advance a reasonable fee for his services, or transfer property to him in compensation for such services or in compensation for the attorney's services in endeavoring to keep the corporation out of bankruptcy.

"If you find from the evidence that the receipt by the Defendant of any property of The Sterling Jewelry & Appliance Company was for services rendered and to be rendered in contemplation of an ensuing bankruptcy proceeding, then I charge you that the receipt by the Defendant of such merchandise or any other merchandise prior to the filing of the proceedings in the Bankruptcy Court was not an offense as charged in count 1 of the indictment. However, if the Government has proved beyond a reasonable doubt that the transfer of the property described in the indictment was knowingly and fraudulently done to conceal said property from the Trustee in bankruptcy, then such act of transfer and concealment is a criminal offense as charged in the first count in the indictment.

"So under the charge in count 1 of the indictment, notwithstanding the bankrupt's indebtedness, the Defendant had the right to receive the bankrupt's property or aid the bankrupt in selling, transferring or otherwise disposing of the property to the Defendant or to others at all times prior to the filing of the petition in bankruptcy on August 30, 1961, and even prior to the adjudication of the bankruptcy on October 16, 1961. But the Defendant, individually or as an aider and abettor, could do this only so long as he did not do so knowingly and fraudulently; that is to say, so long as he did not cause at least one of the items of property alleged to be part of the bankrupt estate to be transferred for the purpose and with the intent to conceal such property or the proceeds thereof from the Trustee in bankruptcy and thereby defraud the creditors of The Sterling Jewelry & Appliance Company."

 Without further quotations therefrom, we are satisfied that the District Judge's total charge covered the legitimate content of appellant's Request No. 3.

3) Alleged prejudicial admonition to jury.

At the week end adjournment following the closing of the proofs, the District Judge spoke to the jury as follows:

"The Court: Now, ladies and gentlemen, we have reached that point in this case where, from your own experiences, or observations, you may well have concluded that you have heard this case. I wish to emphasize at this time that this case is not concluded. The attorneys in this case are going to be permitted to summarize and give you their interpretations of the evi-

dence. They are going to be permitted to argue the case to you, and one of the critical parts of every trial is at this time, as best I can judge it, not going to be given to you until some time Monday, and what I am referring to is the instructions as to the law of this case.

"The instructions which the Court will give as to the law will follow the arguments of counsel. It is not until you know the law of the case that you can arrive at a just verdict.

"Now, I have admonished you at different occasions by calling your attention to the fact that you are not to discuss this case among yourselves until it is finally submitted, and it is not yet finally submitted. I have admonished you that you should not form or express any opinion as to the guilt or innocence of the accused until the case is finally submitted and it has not been finally submitted.

"I have put double emphasis on the fact that you should not permit anyone to speak to you on the subject of this case. Now, you will recall the great care and the extent of inquiry that was made during the voir dire to determine your qualifications as jurors, to determine whether you were persons who had an open mind on the subject of this case, and that you would impartially consider this case and not be influenced by anything except what you heard from the witness stand by way of testimony, and the exhibits and other evidence which the Court has admitted.

"Now, if you should permit anyone to speak to you on the subject of the case, no matter how slight, it is impossible for you to divorce this from your mind. So avoid it. If someone speaks to you and they attempt to speak to you on a subject of this case, you tell them you are on this jury, and when I told you that if anyone persisted in talking to you you should communicate to me, this was no idle suggestion.

"Now, I realize that each of you have husbands and wives and members of your family, and when you go home your wife or husband, as the case may be, is going to say 'How did the case go?' I am not talking about that. Your children may ask you some idle thing about it and you may answer them, but what I am concerned with is that someone who has a deliberate purpose of influencing your mind will do or say something which would so contaminate your mind that you could not follow your oath, and you could not perform the duties you have sworn to perform, and this, of course, is what I am striving with every possible means at my disposal to prevent.

"Now, if any of you have had an experience, an occasion where somebody has sought to talk to you about this case or communicate with you, I don't care what manner, telephone, written, or otherwise, I want you to let this Court know. There may be an occasional reluctance on your part to take part in any inquiry that may follow, but the right, the privilege, of sitting on a jury in this great country is one of the highest privileges which an American citizen has to serve his country and community, and I want you to keep these instructions in mind and come back here Monday morning at 10:00 o'clock in such a state of mind without any contamination as you were in when you began the trial of this case."

Relevant to the foregoing, the appellant's brief states:

"In the late afternoon of Friday, January 29, 1965, the Government concluded its rebuttal evidence. By reason of the late hour of the day, adjournment was in order. Prior to adjournment, however, the United States Attorney requested a conference at the bench with the court and counsel for the defendant and stated thereupon that the Government had learned that some member or members of the jury had been contacted and offered a sum of money. The United States Attorney thereupon asked that the jury be instructed to advise the court if any

member or members had been or should be contacted. Defense counsel represented to the court that neither they nor any person known to them had ever contacted or attempted to contact or influence any juror and that any admonition beyond the scope of the court's usual pre-adjournment admonition would be understood and accepted by the jury as an accusation of corruption and corrupt activities on the part of the defense and/or defendant. The court made no response to the remarks of counsel for either party.

"Believing that the court would desist from any admonitory language beyond the tenor of the usual pre-adjournment admonition, defense counsel upon resuming their seats, were appalled to hear the following."

The brief then goes on to quote the admonition above set out *leaving off, however the first two paragraphs.* While the government's brief disputes the accuracy of appellant's recital of the events that preceded the giving of the above quoted admonition (there is no transcript of the bench conference), we will assume that appellant's counsel has accurately set out his recollection of the facts. His brief's inadvertent failure, however, to include the two paragraphs which prefaced the accused admonition gives a wrong impression of its total context. Rather than a mysterious bench conference immediately followed by the judge's warning to the jury not to speak with anyone concerning the case and to report promptly to him any improper approaches, the judge first commented that the most crucial part of the trial was yet to come, the summation and the instructions—then matter-of-factly followed the pre-adjournment admonition. We find unjustified appellant's following characterization of the District Judge's conduct:

"The words, the tone, the atmosphere, the setting and the prestige of the United States as a party combined to form in aggregate, an almost explicit accusation against the defense and the defendant of jury tampering, guile, dishonesty and corruption."

■ The remarks made by the District Judge were within his discretion, and even though reflection might suggest some different and better way of handling the matter, we are persuaded that the circumstances did not "affect substantial rights" of appellant. Rule 52(a) F.R.Crim.P.

4) Alleged impropriety in allowing the jury to have the written instructions.

■ A written copy of the District Judge's entire charge was given to the jury. The circuits which have considered such action have held that it is within the judge's discretion. See Oertle v. United States, 370 F.2d 719, 729 (CA 10, 1966) and cases cited therein at note 16; United States v. Standard Oil Co., 316 F.2d 884, 896 (CA 7, 1963); McDaniel v. United States, 343 F.2d 785, 789 (CA 5, 1965), cert. den. 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71; Garst v. United States, 180 F. 339, 345 (CA 4, 1910). In view of the length of the trial and the extensive matters covered by the judge's instructions, we find no fault with the District Judge's handling of the matter.

The appellant's claim that Count II of the indictment did not state a criminal offense is, in our view, patently without merit, and we need not discuss it.

Judgment affirmed.

### APPENDIX A

The following are parts of the cross-examination of the witnesses Preisler and Murphy:

Q. Mr. Preisler, do you know what reputation is?

A. Yes.

Q. What is it?

Mr. Carroll: Object.

The Court: Well, he may inquire as to what the witness considers the word means.

Mr. Carroll: May I suggest, your Honor, that the term "reputation" be limited to truthfulness by the prosecutor in his question.

The Court: Proceed with the question.

\* \* \* \* \* \*

Q. What is your—?

A. I would say it is the feeling that the people you were associated with have about you or the people that you meet.

Q. What other people say about him? Do you understand that?

A. Could be.

Q. What people say, or do you agree with me, it is what people say? It is what newspapers say about him and what all the people in the community say? That is a person's reputation? Do you agree with that?

A. Not 100%.

Mr. Carroll: I object to the form of the question.

The Court: I think it would be necessary for instance, the fact that no one is known to have said anything about a person is one of the factors that is significant in the matter of reputation. I will sustain the objection.

If by this question you are asking the witness whether he, in fact, ever heard anybody say anything one way or the other regarding—if that is what you are getting at, I don't know.

Mr. McCurdy: Well, first, I am trying to determine whether or not his opinion was really based upon reputation.

The Court: Well, it wouldn't be reflected from his understanding of the definition of the word.

Q. Well, how did you arrive at your opinion, Mr. Preisler?

A. Personally how I feel about—well, let's give an example: you probably enjoy a reputation by what your intimates think of you, not just by hearsay.

The Court: Well, do you mean by that to say that you have some people that you know, that know Mr. Blane, make a comment of that nature?

The witness: Nothing against him. I am not talking about Morris Blane. You just gave me a definition of reputation.

The Court: Well, let's talk about Morris Blane. Did you come by your opinion from what other people have said about him or not?

The witness: Yes.

Q. Did you come about your opinion from what newspapers said about him or not?

A. No.

Q. Have you read any newspaper accounts about him?

Mr. Carroll: Objection, your Honor.

The Court: Overruled.

A. Yes.

Q. Have you read some newspaper accounts as late as, oh, within the last year or so?

A. Yes, sir.

Q. Did you take into account, or did you not, what you read about him in the newspapers?

A. I didn't believe them.

Q. What didn't you believe.

A. I didn't believe the articles in the newspapers about him.

Q. What articles?

A. Saying that he had done something dishonest.

Q. What did the newspapers say that he had done dishonest?

A. I don't recall.

Mr. Carroll: I move the answer be stricken. I object to the question and answer and move that it be stricken.

The Court: The objection is sustained. The jury is to disregard the question and the answer.

Mr. McCurdy: Could I be heard on it, Judge?

The Court: I have been over it steen times. There is no point in discussing it.

Mr. McCurdy: All right.

Q. Do you believe about Mr. Blane only what you choose to believe?

A. I don't think so.

Q. When you read an account in the newspaper saying that he did something dishonest—?

Mr. Carroll: I object and ask that Mr. McCurdy specify the newspaper of which he is speaking.

Mr. McCurdy: I will be very glad to do that.

Mr. Carroll: May we approach the bench on this matter?

The Court: Yes.

[Colloquy and examination out of the jury's presence. Jury returns]

By Mr. McCurdy: Mr. Preisler, you told us that you read a newspaper account in which—that related that Mr. Blane had done something dishonest. Is that what you said?

A. No, you said that.

Q. What did you say about the newspaper article that you read?

A. I said I read something in the article about Mr. Blane that was an untruth, I felt, that is an untruth.

Q. Didn't you say he had done something dishonest?

A. No, I didn't say he had done something dishonest.

Q. Didn't you say the newspaper said it?

A. Perhaps the newspaper said it, and I said I didn't think he did.

Q. All right. What was it you read in the newspaper that said that Mr. Blane?

A. I don't remember.

\* \* \* \* \* \*

Q. Now tell the jury what it was that you read that you don't believe.

A. I don't remember exactly what it was. It was an article.

Q. If you don't remember, tell us to the best of your recollection.

A. Well, it seems to me that it had something to do with misappropriation of funds in the bankruptcy, and that is about the best that I can remember, to the best of my ability.

Q. Do you recall it charging Mr. Blane with doing anything else other than misappropriating funds?

A. No.

Q. You say that you did not believe it?

A. That is right.

Q. Did you talk with Mr. Blane about it?

A. No.

Q. Did you ask Mr. Blane whether or not he had misappropriated funds?

A. No.

Q. Did you talk to anybody else about it?

A. I don't think so.

Q. Did you consult anybody about whether or not Mr. Blane had misappropriated funds?

A. No.

Q. Then will you say to the Court and jury upon what you found your disbelief of the newspaper article?

A. Only because I think he is honest, and he wouldn't misappropriate funds.

Q. That is your opinion, personal opinion?

A. That is right.

\* \* \* \* \* \*

(Witness Murphy)

Q. Now, being a friend of Mr. Blane's, and being an attache of the Court, are you, would this cause you to be interested in any rumors that you would hear about Mr. Blane or newspaper articles appearing about him?

Mr. Jewitt: We object, your Honor, and ask that the words "newspaper articles" be stricken.

The Court: Well, would it cause you— if you are asking whether it did cause or whether he did hear rumors?

Q. All right.

A. You hear lots of rumors. I don't believe rumors.

Q. Well, did you hear some rumors about Mr. Blane that you didn't believe?

A. You read articles in the paper. I don't believe the articles I read in the paper.

Q. Did you read some articles in the paper about Mr. Blane that you didn't believe?

Mr. Carroll: We object.

The Court: He said that.

A. Yeah, the articles I read in the paper, I don't believe.

Q. All right. More than one article?

A. Yeah. Plain Dealer and Press carry them. I read them.

**Q.** You read them. Can you tell us what you read in either one of the papers about Mr. Blane that you don't believe.

Mr. Jewitt: We object.

Mr. Carroll: May we approach the bench on this matter?

The Court: Yes.

(Thereupon bench conference ensued out of the hearing of the jury)

\* \* \* \* \* \*

The Court: The objection made by Mr. Jewitt \* \* \* is sustained.