THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. DONALD J. KUSS and WALTER MACLYN CONLON, Appellants.

Second Department, April 19, 1971.

*Kenneth K. Rohl* (*Daniel Kirchman* of counsel), for Walter Maclyn Conlon, appellant.

*Bracken & Sutter* (*John Joseph Sutter* of counsel), for Donald J. Kuss, appellant.

*George J. Aspland, District Attorney* (*Maurice Nadjari* and *Carl Spitznagel, Jr.,* of counsel), for respondent.

*Per Curiam.* The defendants, Kuss and Conlon, have been convicted of taking unlawful fees, in violation of section 1826 of the former Penal Law, which prohibited the taking of fees by a public officer for doing an official act. Kuss was a Councilman of the Town of Islip when he allegedly violated the statute. Conlon, an attorney but not a public officer, allegedly aided and abetted Kuss. The act involved was Kuss' introduction of and vote for a resolution by the Town Board which removed certain covenants and restrictions on a 3.3 (approximate) acre parcel of realty in Sayville, Town of Islip. And the charge was that Kuss had been promised $10,000 and was actually paid for this official act by him.

Briefly the facts are these:

In 1957 the subject parcel was in a Residence B zone. It was then owned by a group headed by one Zavatt. Wishing to develop a shopping center on the parcel, the Zavatt group obtained from the Town Board a change of zone to Business 1, subject to a number of restrictions, including requirements that the parcel be developed with a shopping center, that the northerly 75 feet remain residential, that a 15-foot strip become a park and that the construction of the shopping center be com-

pleted within a specified period. The Zavatt group thereafter abandoned its plan and decided to sell the parcel.

In February, 1962 one Fallon, a local attorney, became interested in buying the parcel for a client who wanted to build garden apartment houses on it. Such houses ordinarily were permitted in a Business 1 zone, but could not be built on this parcel because of the restrictions imposed on it in 1957 when the change of zone was granted. Fallon spoke to Kuss about the possibility of having the restrictions removed and was told that the Town Board would not agree. Fallon therefore dropped the matter.

Kuss then brought this deal to Conlon, who in turn brought it to his law partner Gilbert Roseman and the latter's brother Howard Roseman. He told Conlon (and Conlon repeated to the Rosemans) that the parcel could be bought for $43,000, plus a $10,000 payment to Kuss; that they would be able to build apartment houses on the parcel; that pending legislation before the Town Board would soon prohibit such houses in a Business 1 zone and would, moreover, substantially reduce the permitted number of apartments per acre where such houses were authorized; and that the subject parcel would be unique and therefore more valuable because it would not be subject to the forthcoming restrictions. When the Rosemans questioned the size of the $10,000 payment to Kuss, Conlon replied that Kuss (who was also a real estate broker) was doing more than a broker normally could do, as it was Kuss' deal and he had worked out excellent terms with the sellers. Shortly thereafter, Howard Roseman learned of the restrictions on the property. When he asked Conlon about them, Conlon told him that they would have to be changed, but that this was a routine matter.

By contract dated March 10, 1962 the Rosemans and Conlon contracted to purchase the parcel for $43,000, " as is ", in the name of D. W. H. Corporation, a corporation owned by the three of them. The purchase contract obligated the sellers to consent to annulment of the restrictions on the property, but it did not condition the purchase on the removal of the restrictions. The contract further stated that no broker had brought about the sale and made no mention of any finder's fee. The oral agreement between the parties (Kuss, Conlon and the Rosemans) did not specifically make Kuss' fee contingent on the removal of the restrictions, but it did provide that the fee was not payable until Conlon and the Rosemans had recouped their investment and that recoupment could not in fact occur until after the restrictions had been removed.

At some time between March 10, 1962 (when the purchase contract was executed) and March 20, 1962 Conlon drafted a proposed Town Board resolution, on application of the Zavatt group, for elimination of the existing restrictions on the parcel. On March 20, 1962 Kuss introduced such resolution before the Town Board; his resolution followed the form and property description of the draft previously prepared by Conlon. This resolution was unanimously adopted and the Town Board thereby annulled the existing restrictions and replaced them with new ones permitting the erection of apartment houses on the parcel. On that same day (March 20, 1962) the Town Board adopted another resolution, effective 42 days later, which prohibited apartment houses in the Business 1 zone. In October, 1962 the Town Board adopted a resolution reducing the number of apartments per acre that could be built in an apartment house zone; this resolution did not control the subject parcel, so that 100 apartments were permitted on it (and were later actually built) instead of only the 64 that would have been permitted were the October, 1962 resolution applicable.

As a result of these resolutions, the value of the subject parcel was substantially enhanced, since the parcel became the only vacant land in a Business 1 zone that could be developed with garden apartments and it could be developed with many more units per acre than parcels located in apartment house zones.

Thereafter, Conlon and the Rosemans decided not to develop the parcel themselves and on July 16, 1962 they sold it to a developer for $107,500 — more than twice what it had cost them. They received about $19,000 at the closing and the next day (July 17, 1962) they gave Kuss a check for $2,700, which was about what they had left after Howard Roseman took out $6,000 and Conlon and Gilbert Roseman each took out $5,400. Two years later (May 25, 1964) they gave Kuss another check for $6,500, thus making the total payments to him $9,200. These payments were characterized by the Rosemans as a "finder's fee" — a term apparently suggested by their accountant when he was told what Kuss had done to earn this payment.

On these facts the jury convicted Kuss and Conlon of the crime of taking an unlawful fee for performing an official act — Kuss as the public officer, Conlon as his aider and abettor. We believe these judgments should be affirmed.

The defendants contend that the trial court erred when it submitted to the jury, as a fact issue, the question whether the Rosemans were accomplices. They say that this was error

because on this record the Rosemans were in the same position as Conlon; that the three of them (Conlon and the two Rosemans) were either all innocent or all guilty; that if they were all innocent the question of accomplices should not have been brought into the case; and that if they were all guilty the court should have charged that the Rosemans were accomplices as a matter of law. We find no merit in this contention. It is well settled that where a fact question arises as to whether a witness was an accomplice, and different inferences can be drawn, it is the jury, not the court, that must determine that issue (*People* v. *Clougher,* 246 N. Y. 106, 111; *People* v. *Swersky,* 216 N. Y. 471, 476–477; *People* v. *Katz,* 209 N. Y. 311, 332). Here there was such a fact issue, since the Rosemans testified that they had engaged in a lawful business venture, with no knowledge of any illegality; and if that testimony were believed the jury could have found them free of criminal intent and consequently not accomplices of the defendants.

In any event, we see no material prejudice to the defendants even if it were assumed, *arguendo,* that the trial court should have charged that the Rosemans were accomplices as a matter of law. If they were so considered, corroboration of their testimony would have been required. And in this record there is ample proof to satisfy that requirement.

Conlon further contends that the proof did not establish that he was an agent of Kuss and that he consequently could not be held as his aider or abettor. We disagree. One who acts as an agent or intermediary for a public officer in taking an unlawful fee may be convicted, with the public officer, of a violation of section 1826 of former Penal Law (*People* v. *Brody,* 298 N. Y. 352, 358). Here, there is adequate proof to support a finding that Conlon, as Kuss' agent or intermediary, arranged for the Rosemans to join the scheme for purchase of the land, removal of the restrictions, sale of the land at a profit, and ultimate payment of $9,200 to Kuss from the proceeds as his share. And such finding is, in our view, sufficient to support the conviction of Conlon as aider and abettor of Kuss (cf. *People* v. *Morhouse,* 21 N Y 2d 66; *People* v. *Renner,* 16 N Y 2d 645).

In this same connection, Conlon complains about alleged inadequacy of the charge to the jury as to agency. Apart from the fact that we consider the charge adequate in this regard, Conlon did not object to these instructions or request further instructions on this point, so he cannot now complain.

Both defendants argue that they were deprived of a fair trial by the prosecutor's inflammatory summation and his cross-examination of Conlon's character witnesses as to rumors and reports of Conlon's involvement in other improper transactions. With respect to the summation, suffice it to say that we do not find it so improper, when read as a whole, as to warrant reversal, even though some isolated, overemotional remarks in it might have been better left unsaid. With respect to the cross-examination of Conlon's character witnesses, we do not find it outside the permissible bounds delineated by *People* v. *Alamo* (23 N Y 2d 630) and *Michelson* v. *United States* (335 U. S. 469). And if it were, we nevertheless would not deem it such prejudicial error as to warrant reversal, in light of this long, complicated trial and the strong proof of guilt.

We have examined the defendants' other contentions of error and find no merit in them.

The judgments should, therefore, be affirmed.

LATHAM, Acting P. J. (dissenting in part). In this case the People chose to charge appellant Conlon with a violation of section 1826 of the former Penal Law, which is a vague, general " shotgun " statute. A conviction of " aiding and abetting " under such a statute must be closely scrutinized.

In addition to the facts noted in the majority opinion, it should be pointed out that, according to the Rosemans, the People's own witnesses, Conlon's understanding at the very outset, as communicated to these witnesses by Conlon, was that the payment to Kuss was a fee for bringing the deal and that at no time was there any discussion between Conlon and these witnesses that it was for Kuss' services with respect to the covenants and restrictions. It is claimed by Conlon, and I agree, that at no time was it directly elicited from the testimony of these witnesses that he was aware of the covenants and restrictions before Howard Roseman went to sign the contract with the Zavatt group. Nor was anything elicited from these witnesses which would directly discredit Conlon's claim that he became aware of the covenants and restrictions at about the same time as the Rosemans after they had jointly decided to go ahead with the transaction. Accordingly, it is my view that any conclusion to the contrary, implicit in the majority's opinion, is predicated on inferences from the surrounding circumstances adduced and not from any evidence directly probative thereof. I also note that Conlon and his business associates, the Rosemans, on whose testimony the People primarily rely, were joint investors who acquired the property with their own funds.

They also initially intended to develop the property themselves and abandoned the project because they lacked the funds to finance it.

Predicated on the foregoing, on the facts stated by the majority, and on my own review of the record, I am of the opinion that the proof, in essence and realistically viewed, demonstrates that the People failed to establish beyond a reasonable doubt that Conlon in any real sense acted as agent or intermediary for Kuss. The proof shows that Kuss brought a real estate deal to Conlon for a fee and Kuss insured his own interest by effecting the passage of the necessary resolutions by the Town Board. Accordingly, it is my view that Conlon was an investor-principal acting in his own pecuniary interest and I do not consider him to have been an aider and abettor of Kuss in "taking unlawful fees" (statute heading of section 1826) so as to bring him within the purview of the particular statute involved herein (see *People* v. *Brody,* 298 N. Y. 352).

Assuming, *arguendo,* that Conlon's guilt as an aider and abettor be considered to have been established, the judgment against him should in any event be reversed and a new trial ordered as to him. In my opinion, substantial prejudice was engendered by the prosecutor's cross-examination of Conlon's character witnesses. This, together with the prosecutor's inflammatory summation, justifies conclusions that Conlon was not afforded the benefit of a completely impartial and objective evaluation by the jury of his guilt or innocence and that he was thereby deprived of his right to a fair trial.

Surrounding this case was an emotionally charged atmosphere of public criticism precipitated by newspaper publicity which resulted in a change of venue from Suffolk County to Westchester County. In an excess of zeal, the prosecutor brought this atmosphere into the trial in his summation. While this bordered on prejudicial error, I would be inclined to treat it as not substantial enough to warrant a new trial were it not for the additional factor of the prosecutor's prejudicial cross-examination of Conlon's character witnesses, which, in my opinion, tips the scales in favor of a reversal and a new trial insofar as Conlon is concerned.

The nature of this case was such that Conlon's reputation for honesty and integrity was a significant factor which could have affected the jury's evaluation of his version of the transaction involved. He chose to place his reputation in issue. In doing so he presented 12 character witnesses, among whom

were Supreme Court Justices, Town Councilmen and others engaged in public service in Suffolk County, each of whom primarily attested to his reputation for honesty and integrity. In his cross-examination, the prosecutor repeatedly asked questions of the character witnesses with respect to improper collateral transactions in which Conlon was reputedly involved. The following questions asked of one character witness were substantially similar to, if not identical with, those asked of most of the others and are set forth verbatim to demonstrate the thrust of my dissent:

" Q.  *  *  *  did you ever hear that the defendant Conlon, while he was town attorney, was associated with a corporation by the name of WAW Corporation; and further that this corporation had purchased certain property and that they applied for a change of zone on this parcel of property.

" Q. (cont'g)  *  *  *  and had you heard that this organization, WAW, of which the defendant Walter Conlon was a partner and an owner, had purchased a piece of property in the Township of Islip; and further that this company and Walter Conlon had applied for permission from the town board to construct an outdoor movie on that parcel of property; and that this was done while Walter Conlon was town attorney; and further, that Walter Conlon had failed to disclose his interest in this parcel of property to the town board when it voted upon this change of zone; and further had you heard that on the same day that the defendant Conlon and his corporation WAW, had applied for a change of zone to allow a construction of an outdoor movie, another corporation by the name of Grace Operating Inc., an organization by the name of Grace Operating Inc., came into that town board on the same day that Conlon asked for his change of zone, and Grace said, ' I want an outdoor movie house on my parcel of property in Islip '; and had you heard that Grace had been turned down on its application.

" Q. (cont'g)  *  *  *  and had you heard that Grace was turned down for a zoning change for an outdoor theater on the very same day that Walter Conlon was granted permission to place an outdoor theater on this property of WAW, failing to have disclosed this interest to the town board? Have you ever heard that? "

Following an objection by counsel that the prosecutor was getting into a delicate area which could lead to a mistrial, which objection was overruled, the prosecutor continued:

" Q. Had you heard that he was a member of a corporation in the year 1964, while he was town attorney, known as IXB

Corporation; and further that the IXB Corporation purchased a parcel of property next to Town Hall in Islip at the very same time that the Town of Islip itself was attempting to negotiate terms for the purchase of this property; and further have you heard that the defendant Conlon was directed by the town board—when the town board was unable to acquire the property, was directed by the town board, since he was the town attorney, to negotiate terms of purchase with this corporation known as IXB, since the town wanted to purchase the property in question.''

When counsel objected and the trial court stated to the prosecutor that it presumes he is asking whether the witness had heard any rumor along this line, the prosecutor responded: '' More than rumor, even, Your Honor ''. He thereupon continued:

'' Q. (cont'd) And have you heard that the town board directed Walter Conlon, the town attorney, to negotiate terms of purchase for this parcel of property next to the Town Hall; and that Walter Conlon returned to the town board and said, ' IXB won't sell '; and have you heard that *as a matter of fact*, what he was telling the town board was that he was negotiating with himself with one hat acting as town attorney, and with another hat acting as the owner of a property that the town wished to buy—the property that the town wanted to buy; and have you heard that after he told the town board that IXB would not sell the property, that he spoke to the then town supervisor, Mr. Harwood, who testified in this court, and Mr. Harwood said to the town attorney Conlon, the defendant in this case; ' Mr. Conlon, I have heard rumors that you are interested in this property and that you own it; is there any truth in it? ' And that the defendant Conlon * * * [thereupon] said, ' I have nothing to do with the ownership of this property.' And further, have you heard that the town board authorized the town attorney Conlon to condemn the property in question because they wished to use it for town purposes; they authorized him to condemn it, and for the town, he Conlon, condemned it, and in that fashion acquired a tax benefit whereby the profit on the property was taxed only to the 25 percentile; and further, have you heard that after it was disclosed to the town board that the defendant Conlon was interested in this property he asked the town board then to remove him from these negotiations '' (emphasis supplied).

All but one of the character witnesses denied hearing about these incidents and one witness stated that the newspapers

were full of reports in 1967 but not in 1964 when the incidents allegedly occurred.

In my opinion, the effect of the lengthy detailed recitals of factual background contained in these questions was to convey to the jury the impression that the misdeeds referred to had been well documented, investigated and authenticated and were truth and fact. That the prosecutor vouchsafed their truth was reflected in his reaction to the court's attempt to keep the cross-examination on a rumor level by stating, as above noted, that more than rumor was involved. At another point he responded to an objection by offering, *in the jury's presence*, to show his good faith in propounding these questions. At still another point, and again *in the jury's presence,* he stated, *" I am not referring to these incidents as rumors. I would be in bad faith if I used a rumor "* (emphasis supplied). This implantation of the impression of truth and fact was accentuated when the prosecutor repeatedly posed the same question to most of the other witnesses in substantially the same form and length as those above. In my opinion, the prejudicial impact on the jury of these repeated factual recitations, vouched for by the prosecutor, could not be erased by the prosecutor characterizing them as rumors or reports, or by the court admonishing the jury to so consider them.

Since the appraisals of Conlon's reputation by the character witnesses are from their very nature predicated on hearsay, I consider the prosecutor's attempt to test or discredit the accuracy of these appraisals, by referring to other collateral acts in such manner as to attribute to them the stature of truth and fact, an infringement upon Conlon's right to due process and to a fair trial limited to the crime with which he was charged. In arriving at this conclusion I am mindful of the latitude permitted in cross-examining a character witness on the theory that the defendant in using such witness throws open the entire subject of his good name (*People* v. *Alamo,* 23 N Y 2d 630; *Michelson* v. *United States,* 335 U. S. 469). However, I do not find in either of these two decisions a justifiable basis for departure from the established principles (1) that the purpose of the cross-examination of a defendant's character witnesses with reference to particular acts of the defendant is not to establish such acts as facts or to prove the truth of the rumors or charges inquired about, but merely to show the circulation of rumors of such acts and to test the credibility of the character witness by ascertaining his good

faith, information and accuracy (47 ALR 2d 1274), and (2) that the cross-examination as to specific instances of misconduct on the part of the defendant should not be extended to the details or particulars of such acts (47 ALR 2d 1282). Nor do I equate the cross-examination at bar with those embodying the limited specifics in *Alamo* or *Michelson* (cited by the court in *Alamo* as the leading modern case on the subject). I do not consider the cross-examination and the prosecutor's claims of good faith *in the presence of the jury* in keeping with the rationale of the foregoing principles or of the foregoing cases.

This rather difficult area of offering and testing character testimony has been the target of serious and responsible criticism (*Michelson* v. *United States, supra,* p. 473) and has been said to be "full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counterprivilege to the other" (*Michelson* v. *United States, supra,* p. 486). It has also been stated to call for moderation by "discretionary controls in the hands of a wise and strong trial court" (*ibid.,* p. 486). Here, the Trial Judge properly attempted to exercise these discretionary controls but, nevertheless, I believe the cross-examination exceeded the bounds of fairness and propriety.

I do not agree that the relevant proof with respect to Conlon's guilt of aiding and abetting was so strong as to warrant concluding that even if the cross-examination be deemed prejudicial error it is not sufficient to warrant reversal. Nor can I justify any such conclusion because of the length and complicated nature of the trial. In my opinion to permit this cross-examination, coupled with the summation as noted, to remain unchallenged as reversible error is to open the door to a gradual deterioration of the concept of fairness which our judicial system is designed to preserve.

Accordingly, I conclude that the judgment against Conlon should be reversed and the indictment as against him dismissed, or, in any event, that a new trial be ordered with respect to him.

Shapiro, Brennan and Benjamin, JJ., concur in *Per Curiam* opinion. Latham, Acting P. J., concurs in affirmance of the judgment against defendant Kuss, but otherwise dissents and votes to reverse the judgment against defendant Conlon and to dismiss the indictment as against him or, in any event, to order a new trial with respect to him.

Judgments affirmed.