**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Earl D. BUSH, Defendant–Appellant.**

**No. 93–50345.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 31, 1994.

Decided June 28, 1995.

Mary Gibbons, Los Angeles, CA, for defendant-appellant.

Brad M. Sonnenberg, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: WIGGINS, KOZINSKI and DAVID R. THOMPSON, Circuit Judges.

KOZINSKI, Circuit Judge.

The Teamsters have been very, very good to Earl Bush. From 1987 to 1989, Bush worked both as a representative of the International Brotherhood of Teamsters (the International) and as an officer of Teamsters Local 399 (the Local). The Local paid him $100,000 in salary and the International paid him $64,000; both entities gave him generous car allowances; both paid his portion of the Social Security tax; and the International gave him a miscellaneous allowance of $10 for every day of the year. RT 209. It is true that these jobs required Bush to displace himself to such Teamsters trouble-spots as Palm Springs, Las Vegas and Honolulu, but both employers strove to ease this burden somewhat by paying Bush's travel expenses. The Local gave him a credit card to charge food and lodging while he was away on the Local's business. The charges Bush racked up on any given trip varied greatly: A week Bush spent in Hawaii cost the Local $2,496, while a trip to Las Vegas showed only a twenty-three dollar tab at a culinary oasis known as Bun Boy. The International, by contrast, used a per diem system: It paid Bush $130 for each day he was on the road on International business, regardless of actual expenses.

Bush's problems arose in part from his practice of collecting from both employers when he did business for both on the same trip, which happened frequently. In such circumstances, Bush collected his per diem from the International and then also charged some expenses to the Local's credit card. According to the government, this was not just bad form, it was fraud. The government also objected to the fact that both employers paid Bush's full Social Security tax (enabling him to get a tax refund of $3380), and that both gave him a monthly car allowance.

The government premised several counts of fraud on these "double-dipping" practices. The indictment also charged several counts of conversion on the more conventional theory that Bush had billed his employers for trips he had not taken.

Bush raises a variety of claims on appeal, the most interesting of which is that the government failed to prove his double-dipping was fraudulent.

## I. Double-dipping

Because somewhat different issues are raised by the travel expense reimbursements, car allowances and Social Security contributions, we consider them separately.

## A. The Travel Expenses

■ As the government presented this portion of its case to the jury, it did not dispute that Bush had actually traveled on union business and done work for both entities on the same day.[1] What the government sought to prove is that, by billing certain expenses directly to the Local via the union-issued credit card, and then collecting $130 from the International for the same day, Bush was recovering more than his actual expenses. The government did not, however, show that Bush used the Local's credit card to charge unauthorized items; all charges appear to have been for bona fide travel expenses such as meals and lodging. Nor did Bush make any misrepresentations in seeking per diem from the International. To obtain per diem, Bush was not required to provide receipts for out-of-pocket expenses or even to claim he had incurred such expenses. He had to claim only that he had traveled to a remote location and there busied himself with the International's affairs on the day or days in question. RT 266–67 (testimony of Walter Shea). Thus, had Bush boarded with relatives, or slept on a park bench and eaten sandwiches packed from home, he would nevertheless have been entitled to $130 for each day of his stay.

The question then is whether charging specific travel expenses to the Local and then collecting the per diem from the International (neither of which was in itself fraudulent) became fraudulent by virtue of their confluence. We think not. That Bush received $130 from the International does not diminish the fact that he was authorized to charge travel expenses on the Local's credit card. Neither the Local's bylaws nor any other policy required Bush to exhaust funds he received from other sources before he could charge his expenses. Nor did the International require Bush to pay travel expenses out of his own pocket before he could collect the $130 per diem. To the contrary: The International's constitution provides that the per diem is payable in addition to any reimbursements by subsidiary entities such as the Local.[2] The meals and lodging provided at the Local's expense were thus no different from meals and lodging provided by hospitable relatives or the Salvation Army.

The only evidence supporting the government's theory was testimony from two officers of the International who said they would have questioned or disapproved the per diems had they known that Bush's expenses were being covered by the Local. But these witnesses conceded there was no policy prohibiting the payment of per diems in such circumstances, RT 225; the only written policy on point was in the International's constitution.[3] Both officials knew that Bush was employed by the Local as well as the International, and that he and others frequently did business for both entities on the same trip. Both officials were deeply involved in approving travel reimbursements and Bell had authority to audit not only the International's own travel vouchers but also travel reimbursement records of the International's subsidiaries, such as Bush's Local. RT 219. The other witness, Shea, testified he was fully aware that persons employed by the

1. International Vice President Walter Shea testified it was not unusual for someone employed by the Local and the International to do business for both on the same day. RT 266–67.

2. International Constitution Article V, "Salaries and Expenses of Officers," provides: "The provisions for compensation and allowances contained in this entire Article shall be in addition to any compensation and allowances which may be received from subordinate bodies." The government does not dispute that Article V covers the per diem allowance.

3. See note 2 supra. The International's Chief Auditor, Richard Bell, testified outright there was no written policy on reimbursement other than the constitution. RT 225. Shea suggested that the International's reimbursement decisions were made somewhat informally, rather than according to any written policy, but pointed to no instance where someone had been denied per diem because actual expenses were paid by another entity. Per diem had once been denied during a Teamsters Convention when the International itself had paid for hotel and meals, but this is obviously quite different.

There was also no evidence of a Local policy prohibiting payment of expenses for an employee who collected per diem from the International. The Local's Treasurer, Leo Reed, testified that, although he would probably consider it improper for Bush to collect from both employers, he could point to no policy against doing so. RT 352.

International and one of the locals would bill the local for some expenses and then receive the full per diem from the International, RT 266–67, yet Shea did not disapprove per diem requests in such circumstances or issue a policy prohibiting the practice.[4] The record thus shows unmistakably that what Bush did was tolerated, if not actually approved, by the International's management. The two union officials' halfhearted about-face in the midst of the criminal trial, which itself grew out of a major investigation of Teamsters activity, cannot render fraudulent that which was effectively consented to by the supposedly defrauded entity.[5]

The government relies heavily on *United States v. Walsh*, 928 F.2d 7 (1st Cir.1991), but to no avail. In *Walsh*, the government proved that defendant "arranged to receive duplicate reimbursements for travel and other expenses while attending various union functions." *Id.* at 8. There is no indication that any of the entities in *Walsh* were paying defendant a flat per diem without requiring proof of out-of-pocket expenses. As best we can tell from the brief statement of facts in *Walsh*, the defendant there simply sent the same bills to two entities. Where each organization requires proof of out-of-pocket expenses, it might be fraudulent to seek reimbursement from one without disclosing that the same bills are also being covered by the other. Here the International required no proof that Bush had incurred any out-of-pocket expenses, and Bush never made any

representations to that effect. This is a distinction with a difference.

## B. Car Expenses

■ The government proved that Bush received about $800 a month from the Local by way of a car allowance, while the International paid him about $300. RT 208–09. The government also showed that neither entity knew the other was giving Bush such an allowance, that the Local would have considered it improper for Bush to be reimbursed twice for the same costs and that, had it known, the International would have investigated to ensure that Bush wasn't being overcompensated. RT 217, 331, 344. The government failed to prove, however, that Bush *was* being overcompensated—i.e., that payments from the two entities exceeded his actual car expenses. Eleven hundred dollars per month is certainly on the high side, but not so high as to patently exceed Bush's actual monthly car expenses. Without proving the cost of the car Bush was driving, how much gas it consumed, and what he paid for repairs, cleaning and insurance, the government failed to prove that the combined total Bush received as a car allowance exceeded his out-of-pocket expenses. The absence of such evidence—which was by no means beyond the government's reach—amounts to a failure of proof on this aspect of the government's case.[6]

■ The government relies on *Walsh* for the proposition that, once it proved Bush had

---

4. Shea explained that the International did not expect the $130 per day to precisely cover expenses on every trip. When the employee traveled to an out-of-the-way location, the per diem could far exceed hotel and meal expenses, while elsewhere the per diem could fall short of expenses. RT 278. The International did not vary the per diem according to location, expecting that a surplus on some trips would be offset by a deficit on others. RT 278, 281. This undisputed evidence points to another defect in the government's case, which focused on whether Bush's billing practices resulted in a windfall to him on individual trips. Even accepting the post-hoc policy described by the government's witnesses, that policy would have been violated only if Bush had made money in the long run as a result of his dual billing. There was no proof that he had.

5. Bush was not charged with tax evasion, so we express no view whether his billing practices

resulted in any imputed income on which he should have paid taxes.

6. This is not to say that such a showing would have been sufficient to establish fraud. The scant evidence concerning the car allowances gives no indication that officials were required to spend the entire allowances on their cars, or even to have cars at all. The International's own accounting system classified the car payment not with "expenses," but with "allowances" such as the $10 "miscellaneous allowance" representatives received every day of the year for incidentals such as cabs and parking. RT 253. Just as Bush was entitled to the $10 each day, weekends and holidays included, whether or not he strayed from his davenport, so too was he entitled to the same car allowance as his colleagues, regardless of actual car expenses or other sources of income.

collected from both entities for the same type of expense, the burden shifted to the defendant to show that his expenses equalled or exceeded the amounts he was paid. We do not read *Walsh* so broadly. As noted, in *Walsh* the government proved defendant had submitted the same bills to more than one entity and thereby obtained multiple reimbursements. Walsh nevertheless argued he had not taken the money for his own use because the duplicate payments had defrayed other union-related expenses he had incurred. Since the government had established that Walsh had fraudulently obtained dual reimbursements, it was entirely appropriate to saddle him with the burden of showing that the duplicate payments could be justified in some other fashion. Here the government failed to prove fraud in the first place because it failed to show that Bush's car allowances exceeded expenses. To require Bush to prove that the payments he received did *not* exceed his expenses would unconstitutionally shift to the accused the burden of disproving fraud—an element of the government's case-in-chief. *See Sandstrom v. Montana*, 442 U.S. 510, 515–17, 99 S.Ct. 2450, 2454–56, 61 L.Ed.2d 39 (1979); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

### C. Social Security Tax

■ Both the International and the Local paid Bush's portion of the Social Security tax. As a result, Bush obtained a refund of the duplicate portion of his Social Security contribution, which amounted to $3380 in 1988. Although there was evidence that Bush didn't tell either employer the other was paying his Social Security tax, there was no evidence that either had a policy against paying the employee's share of Social Security where another employer did the same. *See* RT 217. Nor is it clear why an employer would adopt such a policy: Paying the employee's share of Social Security is not an expense reimbursement, it's a benefit like life insurance or a pension plan. The unions here paid both halves of Social Security on behalf of every employee and, as the International's Bell admitted, paying the Social Security was equivalent to a salary increase of $3380. RT 220. Lou Reed, a member of the

Local's executive board, testified that the Social Security policy was adopted in lieu of a salary increase so as to make union officials' compensation package more acceptable to the members. Reed also stated that increasing this form of benefit was proper, had been approved by the board, and saved the Local money because a *salary* increase of $3380 would have entailed a corresponding increase in other benefits. The government might as well be arguing that, since Bush was already being paid a salary from the International, it was fraudulent for him to also collect a salary from the Local.

### D. Summary

The nub of this portion of the government's case seems to be that Bush collected for similar items from two employers that had similar names. But there is nothing fraudulent about negotiating similar compensation packages with more than one employer. To establish fraud, the government had to show that the employee obtained the payments in question by means of a material misrepresentation or omission. The government produced no such proof: no false certifications, no flouting of policies against dual contributions, nothing at all amounting to a "scheme to defraud." A dispassionate reading of the record reveals that what Bush did was tolerated—perhaps even encouraged—by his employers. It seems strange and more than a little unfair for the government to take up the cudgels on behalf of a "victim" who was clearly a knowing and willing participant in the alleged misconduct. Whatever one might say about the wisdom and prudence of the Teamsters' compensation scheme (and we see nothing terribly unusual about it), this was clearly not a case where defendant pulled the wool over anybody's eyes. The government thus failed to prove what we see as a pretty important element of any fraud case, namely fraud. The convictions on the double-dipping counts must therefore be reversed. *See Tamapua v. Shimoda*, 796 F.2d 261, 263 (9th Cir.1986) (what government proved did not add up to a crime because of dearth of evidence on an essential element).

## II. Fictitious Trips

██ Bush was thus home free so long as he actually took the trips and conducted the meetings for which he was being paid. But, alas, Bush pushed a good thing too far. The conversion counts, as well as some of the mail fraud counts, were based on monthly reports to the International in which Bush claimed, and was paid the per diem for, traveling to meetings the jury could reasonably have found never took place.

The government showed that the person Bush claimed to have met on some trips had not been in the city to which Bush was traveling. Bush argues that on those occasions he had conducted the meeting before traveling to the city in question. This story, even if believed, doesn't explain why the International should pay for the trips: A pleasure trip taken after a business meeting at home doesn't count as business travel. Bush offered no evidence about his trips, much less proof that the trips had a business purpose. The jury could thus easily have found that Bush had sought and obtained per diem for trips that had no business purpose. The counts falling into this category are 5, 6, 13, 15 and 16.

Count 14 concerns Bush's per diem claim for meetings with James Counter in Palm Springs on March 12, 1988. GER 321. Counter was not in Palm Springs that day, as he attended a Director's Guild Awards dinner in Beverly Hills. Bush argues that he too attended the Guild dinner, and so could have met with Counter there. Even if Bush had been entitled to per diem for attending an event in far-off Beverly Hills, he presented no evidence that he was at the Guild dinner, Counter didn't recall seeing Bush there, and Bush's monthly report shows he remained in Palm Springs until the day after the dinner. The jury was entitled to find that Bush and Counter never met that day.

Count 16 concerned two other meetings the jury could reasonably have believed were fabricated. First, Bush's monthly report said he had a meeting with a Mr. Thompson of the Los Angeles Police Department, but the evidence suggested they saw each other at a golf tournament, if at all, and per diem isn't allowed for attending a golf tournament.[7] Second, Bush claimed he met with James Counter on September 2nd and 3rd. While Bush and Counter could have met on the 2nd before they left for Palm Springs and Lake Tahoe respectively, they were clearly not in the same city on the 3rd. RT 409.

Count 17 concerns reported meetings on November 12–13 with the Alliance of Motion Picture and Television Producers in Palm Springs. GER 337. There was testimony that James Counter was Bush's only contact with the Alliance, RT 404, and that Counter was in New York and New Orleans the whole time Bush was in Palm Springs. RT 410.

Finally, count 18 concerns Bush's claim that he met with someone from Teamsters Local 542 on November 23–24, 1988. Richard Aceves, the chief executive of Local 542, testified that his office kept a calendar reflecting all the meetings of Local 542's officials, and that no appointment with Bush was noted on those days. RT 317. Worse still, November 24 was Thanksgiving and the office was closed. *Id.* The jury was entitled to believe that Bush had made the whole thing up.

## III. Impeachment of Shea

██ Bush argues the district court erred by allowing the government to ask Walter Shea whether he'd heard that a civil RICO action had been filed against Bush. The court ruled that Bush's counsel had opened the door to this question by asking Shea to vouch for Bush's character.

██ A witness who has endorsed the character of the defendant may be cross-examined about whether he's heard about prior bad acts of the defendant. Fed.R.Evid. 405(a) (character witness may be cross-examined about specific instances of misconduct); *Michelson v. United States,* 335 U.S. 469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948) (character witness may be asked whether

---

7. RT 370–71. "Attending a golf tournament" is, of course, only a vulgar colloquialism for what Officer Thompson was up to that day. According to Thompson, he had been "on a special detail at the San Bernardino Country Club on liaison activity."

he's heard about defendant's prior arrests). In *SEC v. Peters*, 978 F.2d 1162 (10th Cir. 1992), for example, the court held that the SEC should have been allowed to ask the defendant's witnesses about a prior civil fraud suit he had settled.

The government here asked Shea questions very similar to those in *Peters*. Bush's counsel had asked Shea about Bush's character, to which Shea replied, "I can't say I'm very close to Earl Bush, but I never known him to have any problems, and that's as near as I can say." On redirect, after a lengthy sidebar, the government was allowed to impeach Shea by asking whether he'd heard about the civil RICO charges. Shea admitted he was aware that the Justice Department had brought a civil RICO suit against the Teamsters and set up a special investigations office for the purpose. The government then asked,

> Q. And are you, also, aware that that office filed administrative charges against Mr. Bush?
> A. Yes, sir, I am.
> Q. And are you aware that those charges accused Mr. Bush of financial misconduct?
> A. Yes, sir.

RT 306.

There is, however, an odd wrinkle that sets this case apart from *Peters* or the run-of-the-mill *Michelson* case. It's clear from the argument at sidebar that the administrative charges against Bush did not reflect prior misconduct, but earlier consequences of the *very same conduct* for which Bush was now being criminally prosecuted. Had this been revealed to the jury, they would have realized that the civil RICO charges did not contradict Shea's assertion that he had never known Bush to be in trouble before.

In phrasing the question, the government lawyer did not specify when the events underlying the civil RICO action had taken place; he spoke generally of "financial misconduct," which the jury could not have known meant the billing practices at issue in this trial. The court's limiting instruction could only strengthen the jury's misimpression that the civil RICO charges arose out of some separate bad acts: "The defendant is not accused, in this case," the court admonished, "of the things that were just mentioned," when in fact Bush *was* accused of the very same misconduct that had been subject of the RICO charges.

■ It's doubtful whether Rules 404 and 405 contemplate impeaching a character witness with evidence that seems to concern a prior bad act but does not. Bush, however, did not object on this ground and has therefore waived the issue. Bush did, however, argue that the evidence should be excluded under Fed.R.Evid. 403, as it clearly should have because it had no probative value and was highly prejudicial.[8]

First, Shea's knowledge of the Civil RICO lacked probative value because it is entirely consistent with his original testimony that he'd never known Bush to be in trouble before. Shea could know about various complications arising from Bush's sole alleged misstep and still be able to assert truthfully that, before that misstep, Bush had never been in trouble.

Second, the testimony was prejudicial precisely because it suggested that the RICO charges represented a separate incident of misconduct somewhere in Bush's past. The prejudice to the defendant here is of the special variety we noted in *United States v. Hitt*, 981 F.2d 422 (9th Cir.1992), because it raises a *false* damaging inference about the defendant. Where the testimony not only lacks probative value but actually leads the jury to draw false inferences about the accused, only a slight showing of prejudice need be made to tip the scales toward exclusion. The district court erred in admitting this testimony.

---

8. Evidence admissible under Rules 404 and 405 must still pass muster under Rule 403. *See, e.g., United States v. Wellons*, 32 F.3d 117, 120 n. 3 (4th Cir.1994) (evidence of prior bad acts properly admissible under Rule 405(a) was properly excluded pursuant to Rule 403); *United States v. Waloke*, 962 F.2d 824, 830 (8th Cir.1992) (same); *United States v. Sneezer*, 983 F.2d 920, 924 (9th Cir.1992) (evidence of other crimes admissible under Rule 404(b) only if probative value outweighs prejudice).

**490**

The error, however, was harmless. The jury was instructed quite emphatically that it could not consider impeachment evidence for substantive purposes, RT 306–07, and we presume the instruction was obeyed. *See United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1781, 123 L.Ed.2d 508 (1993). The effect of the improper impeachment then was only to neutralize Shea's mild endorsement of Bush's character. We doubt the jury would have been much swayed by Shea's assessment of Bush's reputation, guarded as it was. The evidence as to the fictitious trips, in particular, was strong and clear-cut; nothing Shea said about Bush's reputation could possibly have rescued him from conviction thereon.

### IV. Ex Parte Communications

Bush argues that the district judge violated due process and compromised the trial by communicating with a juror about the juror's reimbursement for lodging expenses. The coincidence between the judge's approval of a juror's request for reimbursement and the fact that the case was about expense reimbursements could not possibly have affected the outcome of the trial. *See United States v. Birges,* 723 F.2d 666, 670–71 (9th Cir.1984).

### V. Conclusion

This case began with a remarkably opaque indictment, and proceeded by the elaboration of multiple theories of fraud, based on various trips and reported business activities, coexisting and overlapping in each count. We therefore vacate Bush's convictions on all counts and remand for a determination by the district court as to the proper disposition of each count in accordance with the following instructions: Convictions on counts where the jury could have returned a guilty verdict based only on one of the "double-dipping" theories are reversed with prejudice and Bush may not be retried. *See Burks v. United States,* 437 U.S. 1, 16–18, 98 S.Ct. 2141, 2149–51, 57 L.Ed.2d 1 (1978) (Double Jeopardy Clause precludes retrial following

reversal for insufficiency of the evidence). As to counts where the verdict could have been based only on evidence of the fraudulent trips, the convictions are affirmed and may be reinstated. As to counts where the jury could have convicted either on a theory of double-dipping or on a theory of fake trips, the convictions are reversed without prejudice to reinstatement of the charges and retrial.

### VACATED and REMANDED.